# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

Laird, Appellant, *v.* Pittsburg.  Baird, Appellant, *v.* Pittsburg.  Stenger, Appellant, *v.* Pittsburg.

205
219
1
622

*Municipalities—Eminent domain—Condemnation of land for park purposes—Free library.*

A public park is a public pleasure ground, primarily involving the idea of open air and space, but not excluding occupation in part by monuments, statues, museums, galleries, of art and other agencies contributing to the aesthetic enjoyment of the people.

A municipality may condemn land for park purposes, although the intention of the municipality is to use the land in order to extend a free library and art building already standing on other land which is part of a public park.

The fact that the city has committed the administration of the library to a board of direction in which it has a representation of only one half, does not prevent the condemnation from being for a public purpose.

Argued Nov. 3, 1902. Appeals, Nos. 94, 99 and 100, by plaintiffs, from decrees of C. P. No. 2, Allegheny Co., July T., 1901, Nos. 494, 715 and 765, dismissing bills in equity, in cases of James Laird v. City of Pittsburg et al., Milton I. Baird v. City of Pittsburg et al., and Joseph W. Stenger v. City of Pittsburg et al. Before MITCHELL, DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Bills in equity for an injunction.

FRAZER, P. J., found inter alia the following facts:

The city by ordinance set forth and ordained " . . . . that the city of Pittsburg deems it proper and expedient that it exercise the power of eminent domain, vested in said corporation, for the acquirement by it of the real estate hereinafter described, to be used for park purposes. Therefore, the director of the department of public works of the city of Pittsburg is hereby authorized and directed to proceed in the name and on behalf of said city, to have taken, appropriated and condemned for park purposes, in the manner described by law, the real estate and property of James and Eliza Laird, situate in the 14th ward of said city, bounded and described as follows, to wit: . . . . And the said city does hereby elect and resolve to take, use and appropriate the said real estate and land for the purposes aforesaid, the damages not having been agreed upon between said city and said owner, and the said parties being unable to agree upon the same."

The land described in plaintiff's bill adjoins a public park of the city, known as Schenley Park, which contains 422 acres, of which one and eighty-three one hundredths are occupied by the Carnegie Free Library building, four acres by the Phipps Conservatory, two and two thirds acres by music stands, athletic grounds and race course.

For the purpose of enlarging Schenley Park, the city has proceeded, under its right of eminent domain, to purchase and acquire, by condemnation proceedings, the properties of plaintiff and others; that the properties so purchased and acquired contain together about 150,000 square feet of land. The property of plaintiffs was acquired by condemnation proceedings, and not by purchase.

The Carnegie Free Library building contains a free library, an art gallery, museum and music hall, which building was completed in the fall of the year 1895 and dedicated to public use on November 10, 1895.

The Carnegie Free Library was founded through the donation of Andrew Carnegie, under an ordinance of the city, approved February 25, 1890, and its supplements, so that the funds for the erection of the building and the equiping of the library were furnished by the donor, while the city undertook to appropriate $40,000 per annum to maintain the same; and whereby the location, erection and management of that insti-

tution were entrusted to a board of directors composed of the mayor of the city, the presidents of select and common councils, the president of the central board of education, and a library committee of five persons appointed by the councils of the city, and nine other persons appointed originally by the donor, with the right and power in the nine persons so appointed to fill vacancies in their number and to elect their successors.

The library and reading rooms in the building are open to the public free of charge ; free public musical entertainments are given at least twice a week in the music hall of the library building; the hall is frequently let for entertainments, for which a rental is charged, the amount of the rental depending upon the nature of the entertainment, the purpose for which given and by whom given. The museum and art gallery, which occupy rooms in the building, are under the control of the Carnegie Institute, which is managed by a distinct board of trustees, though its occupancy of rooms in the Carnegie Library Building is with the permission and co-operation of the board of trustees of the Carnegie Free Library ; the museum and art gallery are open throughout the year to the public, without charge.

The board of trustees of the Carnegie Free Library has the management of the library building, and also the expenditure and disbursement of all funds belonging and applicable thereto, including the $40,000 annually appropriated by the defendant city to assist in defraying the expenses necessary in maintaining the same.

The trustees of the Carnegie Free Library desire to extend and enlarge the present library building at a cost of $3,600,000, which sum has been donated by Mr. Carnegie, and is now subject to the order of the trustees, to be used by them for that purpose.

It is the intention of the board of trustees of the Carnegie Free Library to ask permission of the councils of the city to use and occupy a further portion of Schenley Park, to erect thereon the proposed addition to its library building. That the land necessary for such extension includes, among other property, the lots taken from plaintiff, and will require an area of about 96,000 square feet.

The court entered decrees dismissing the bills.

*Errors assigned* were decrees dismissing the bills.

*S. S. Mehard* and *A. W. Duff*, with them *H. E. Carmack* and *H. A. Miller*, for appellant.—The evidence shows that the property of appellant is being taken by defendant for purposes of the Carnegie Library. The city of Pittsburg cannot exercise the power of eminent domain in taking land for the purposes of Carnegie Free Library, because that institution is not under the control of the city and its property is distinct from that of a public park: Lance's App., 55 Pa. 16.

The city of Pittsburg cannot exercise the power of eminent domain in taking land for the purposes of Carnegie Free Library, because such use would be inconsistent with that of a public park: Mayor, etc., of Allegheny v. Ohio, etc., R. R. Co., 26 Pa. 355 ; Com. v. Erie, etc., R. R. Co., 27 Pa. 339.

The following cases show that lands taken for public use as a park cannot lawfully be diverted to inconsistent uses, even of a public nature: Wartman v. Philadelphia, 33 Pa. 202, 210 ; Burton's Appeal, 57 Pa. 213, 220; San Francisco v. Itsell, 80 Cal. 57 (22 Pac. Repr. 74) ; Cummings v. St. Louis, 90 Mo. 259 (2 S. W. Repr. 130) ; Church v. Hoboken, 33 N. J. L. 13 ; Rowzee v. Pierce, 75 Miss. 846 (23 So. Repr. 307) ; Princeville v. Auten, 77 Ill. 325.

*James C. Gray*, with him *Thomas D. Carnahan*, for appellee. —The land of the appellants was acquired for park purposes. This is evidenced by the ordinances: Com. v. Keary, 198 Pa. 500; Freeport Borough v. Marks, 59 Pa. 253; Shields v. Pittsburg, 201 Pa. 328.

OPINION BY MR. JUSTICE MITCHELL, January 5, 1903 :

These cases might well be affirmed on the technical ground, found by the court below, that the power of the city to acquire land by eminent domain for park purposes is undisputed, and the ordinance and proceedings for that purpose are regular. But the case having been argued and fully considered on the real ground of controversy, that the use proposed to be made of the land is not within the legitimate scope of park purposes, we proceed to determine the cases on the merits.

A public park in the popularly accepted meaning of the present time may be comprehensively defined as a public pleasure ground. The definitions by the lexicographers do not vary much from this. Worcester calls it " a piece of ground enclosed for public recreation or amusement; " Webster, " a piece of ground in or near a city or town enclosed and kept for ornament and recreation; " the Century Dictionary, " a piece of ground, usually of considerable extent, set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as an opportunity for open air recreation." No doubt the idea of open air and space with the land kept in grass and trees, as if approximately in the state of nature, still inheres in the general understanding of the word, but it is no longer the dominating thought as it formerly was. The chief amusements of the great body of our ancestors in England were in the open air, and a park meant for them practically a small or private forest, left in condition for the home of wild animals of the chase. Blackstone defines a park as " an enclosed chase extending only over a man's own grounds. The word park indeed properly signifies an enclosure; but yet it is not every field or common which a gentleman pleases to surround with a wall or paling and to stock with a herd of deer that is thereby constituted a legal park; for the king's grant or at least immemorial prescription is necessary to make it so. Though now the difference between a real park and such enclosed grounds, is in many respects not very material; only that it is unlawful at common law for any person to kill any beasts of the park or chase, except such as possess these franchises of forest, chase or park: " 2 Comm. 38.

With the change of manners and habits of the people came also a change in their associations with the use of words. The idea of a public park in or near a city as a place of resort of the people generally for recreation and amusement necessarily banished the idea of a home for wild beasts of the chase even in a very modified state of nature. The trimming away of thickets and underbrush, the substitution of regular pathways paved and perhaps railed and artificially lighted, which would have been incongruous to our forefathers now enter into the accepted idea of a park. The growth of sentiment for artistic adornment of public grounds and buildings is part of the history

of our time and country. Public parks have come to be recognized as not only the natural place for walks and drives afoot, awheel or with horse and carriage, for boating, skating and other outdoor athletics, but also as the appropriate and most effective location for monuments and statues, either to historic heroes or to pure art, fountains, flower displays, botanical and zoölogical gardens, museums of nature and of art, galleries of painting and sculpture, music stands and music halls, and all other agencies of aesthetic enjoyment of eye and ear. The parks of cultivated Europe are filled with works of art, and the great cities of this country are following fast in the same direction. Schenley Park in Pittsburg with which this case is immediately concerned, already devotes a portion of its space, as found by the court below, to the Phipps Conservatory of flowers, to music stands and to the Carnegie Free Library building, as well as to athletic grounds and a race course. The Carnegie Free Library building, as also found by the court below, contains a free library, an art gallery, museum and music hall, all free to the public.

The power to take by eminent domain is expressed in the statutes to be " for the purpose of public parks." No further legislative definition is given, and it must be assumed that the words are used according to their general understanding. This as already indicated includes all the customary forms of the use of land as a public pleasure ground. The Free Library Building as already said contains an art gallery, museum and music hall besides a free library. The latter is as much devoted to the public recreation as the other parts. It affords a place of resort and entertainment for the public at large in rainy and inclement weather, and at all times for those who prefer quiet study to sight-seeing or more active amusement. It may be conceded as argued by appellants that a library in itself is not an integral part of a park, and were the taking here complained of a taking directly and solely for a library site, a different question would be presented. But a library occupying only a very small fraction of the park area, not interfering at all substantially with its open air and free space, does not differ in legal effect from the museums, picture galleries, music stands and other incidental means of promoting the entertainment and pleasure of the people. Should the city, therefore, decide to devote the

land now in controversy to the enlargement of the Free Library Building it could not be fairly said to be a use outside of what is legitimately implied in the authority to take for a public park. We have not found or been furnished with any case on the exact point here raised, but the analogous principles applicable to the use of a public square in a town plot, are discussed in Com. ex rel. v. Connellsville, 201 Pa. 154, and cases there cited.

The further objection that the city cannot take this land because the Carnegie Free Library is not under the control of the city and its property is distinct from that of a public park, is also untenable. The city takes and keeps the title and control of the land, though it commits the ordinary management, what may be called the police administration, to a board of direction in which it has by election and ex officio a representation of one half. This is not a taking of the property for a private institution.

Decree affirmed with costs.