## Bernstein, Appellant, v. Pittsburgh.

Argued October 10, 1950. Before DREW, C. J., STERN, STEARNE, JONES, LADNER and CHIDSEY, JJ.

*W. Denning Stewart,* with him *Ralph H. German, Harton S. Semple, L. Wesley Martin, Jr.,* and *Rose, Eichenauer, Stewart & Rose,* for appellants.

*Anne X. Alpern,* City Solicitor, with her *Bennett Rodgers,* First Assistant City Solicitor, and *John M. Marshall,* Assistant City Solicitor, for City of Pittsburgh, appellee.

*Paul Kern Hirsch,* with him *William S. Moorhead, Jr., Carl E. Weise* and *Hirsch & Weise,* for Trustees, appellees.

OPINION BY MR. JUSTICE HORACE STERN, January 2, 1951:

We agree with the court below that the City of Pittsburgh may legally erect an open-air auditorium in Schenley Park and lease it during summer months to a private, nonprofit corporation for the presentation by the latter of light opera for which admission charges will be made.

In 1889 Mary E. Schenley conveyed to the City of Pittsburgh a tract of land containing approximately 300 acres "for the use of the people of Pittsburgh and the Public as a Public Park and for the use and purpose of establishing on said grounds a Public Park and place of free, attractive and healthful resort, and open air recreation for the people of Pittsburgh and the Public and perpetually keeping and maintaining the same for such uses and purposes and for no other use or purpose whatever." Subsequently the city acquired

additional tracts so that at present the park consists of 427 acres.

The city now proposes to accept from the Edgar J. Kaufmann Charitable Trust a gift of $500,000 for the erection of an amphitheatre, and to match this gift with an appropriation of $500,000 toward the cost of construction. The structure will be erected on a suitable site in Schenley Park, occupying an area of 4½ acres with an additional 10 acres for automobile parking; the title will be and remain in the City of Pittsburgh. The plan contemplates a ten year leasing of the building for the period each year from June 1 to September 15, at a nominal rental, to the Civic Light Opera Association of Greater Pittsburgh, which is a nonprofit corporation chartered for the purpose of producing, "for the culture, education, enjoyment, and civic welfare of the people of Pittsburgh and the Tri-State Area, operas, concerts, recitals, pageants, theatricals and other types of cultural, recreational and educational entertainments". This Association will present musical and theatrical performances, charging reasonable prices for admission.

Two taxpayers of the city filed a bill in equity on their own behalf and on behalf of all other taxpayers who might join therein, asserting that the city was without authority to build such an outdoor theatre, that its location in Schenley Park would violate the restricted purposes for which Mary E. Schenley had deeded the land to the city, and that the ordinance of the city which provided for the carrying out of the project was illegal in that it involved the pledging of the city's credit for the maintenance of a private enterprise and the delegation of the control and supervision of municipal property to a special commission. The bill prayed that the city and its officials be enjoined from carrying out the agreement entered into with the Edgar J. Kaufmann Charitable Trust and the Civic Light

Opera Association, from executing the proposed lease, and from constructing the building; also that the ordinance be declared illegal and void. The learned court below dismissed the bill.

Has the City of Pittsburgh legal authority to erect a structure of the nature here contemplated? The answer to this question is furnished by the Act of July 8, 1919, P. L. 783, which provides that cities shall have power to take, purchase, or condemn property for the purpose of erecting thereon, inter alia, public auditoriums, to appropriate money for the erection thereon of such auditoriums and for their operation and maintenance, and to charge a nominal rental for their use. The structure here planned is undoubtedly an "auditorium", which has been defined as any large room, hall or building more especially designed for use for lectures and dramatic and musical entertainments. Moreover it is a *public* auditorium since the title and control of the use of the building remain at all times in the City of Pittsburgh; the Opera Association agrees that even during the summer months it will not interfere with the city's use of the building for other public purposes when not actually in use for the operatic performances.

May this open-air auditorium be built on the land conveyed to the city by Mary E. Schenley? If it does not come within the scope of the express purposes for which the land was deeded the project must, of course, fall,—a question that may properly be raised by a taxpayer's bill to enjoin the carrying out of the enterprise and to compel the use of the park in strict accord with the objects of its dedication: *Morrow v. Highland Grove Traction Co.*, 219 Pa. 619, 625, 69 A. 41, 43; *Trustees of the Philadelphia Museums v. Trustees of the University of Pennsylvania*, 251 Pa. 115, 122, 123, 96 A. 123, 125; 16 Am. Jur. 412, §65. And while it is true that, where land is conveyed by the owner to a mu-

nicipality for park purposes, as distinguished from a situation in which the municipality itself purchases or condemns land and establishes a park thereon, the terms of the grant must be narrowly construed and the uses to which the land may be put correspondingly restricted, (39 Am. Jur. 817, §21; McQuillin, Municipal Corporations, 3rd ed. vol. 10, pp. 125, 126, §28.52), nevertheless, even under that rule of construction, the building of this open-air auditorium in Schenley Park would seem to come well within, and to be in no way inconsistent with, the purposes specified in the deed from Mary E. Schenley as those to which the use of the land so conveyed was to be limited.

Scanning the phraseology employed by the grantor it is wholly clear that the primary purpose for which the land was to be used by the "people of Pittsburgh and the Public," was that of a "Public Park"; this is twice stated within the small compass of the language employed to define the prescribed uses. What constitutes a "public park"—its attributes and dominant characteristics—is very generally understood and must have been likewise understood by Mary E. Schenley. A public park may be defined as a tract of ground kept more or less in its natural state, or embellished by the planting of additional trees and flowers, and devoted to the purposes of pleasure, recreation and amusement. In ancient times the term "park" was applied to an enclosed tract stocked with beasts of the chase, such as that described by Xenophon as belonging to Cyrus, King of Persia, but, as humorously pointed out by Mr. Justice DEAN in *Commonwealth v. Hazen,* 207 Pa. 52, 57, 56 A. 263, 265, the ordinary citizen of today does not obtain his notion of a park from a reading of the Anabasis. In modern times the principal purpose of a park, namely, public recreation, is not limited to physical recreation but includes aesthetic recreation and mental and cultural entertainment as well. While the

entire park acreage or any substantial part of it cannot, of course, be built upon so as unduly to destroy the enjoyment of fresh air, sunshine and exercise, the erection within its borders of monuments, museums, art galleries, public libraries, zoological and botanical gardens, conservatories, and the like, is commonly recognized and accepted as being within the normal scope and ambit of public park purposes, and an open-air public auditorium comes within the same category as such another permissible structure: *Los Angeles Athletic Club v. City of Long Beach,* 128 Cal. App. 427, 17 P. 2d 1061. Nor is the propriety of the operation of enterprises of that nature within the park limits militated against by the fact that patrons may be obliged to pay for admission thereto; in Schenley Park itself there have been maintained for many years a public golf course, a restaurant in connection therewith, a swimming pool, tennis courts, a bowling green, a riding academy, and occasional flower shows, for the use of all of which, as also for boat rentals on the lake, charges have been exacted, and this without challenge by either the representatives of the Mary E. Schenley estate or her heirs, or by anyone else; the Phipps Conservatory, which also is located in Schenley Park, makes admission charges at certain times, and the same is true in connection with some of the entertainments given in Carnegie Music Hall which is a part of the Carnegie Free Library Building.

In *Laird v. Pittsburg,* 205 Pa. 1, 54 A. 324, the City of Pittsburgh, for the purpose of enlarging Schenley Park, condemned a tract of adjoining land and the Trustees of the Carnegie Free Library sought to extend and enlarge their then present building in the park and for that purpose to occupy additional acreage therein. This Court, affirming a decree of the court below dismissing bills in equity which had been filed in opposition to the project, said (pp. 5, 6, A. p. 325): "No

doubt the idea of open air and space with the land kept in grass and trees, as if approximately in the state of nature, still inheres in the general understanding of the word ["park"], but it is no longer the dominating thought as it formerly was. The chief amusements of the great body of our ancestors in England were in the open air, and a park meant for them practically a small or private forest, left in condition for the home of wild animals of the chase . . . . With the change of manners and habits of the people came also a change in their associations with the use of words . . . . The growth of sentiment for artistic adornment of public grounds and buildings is part of the history of our time and country. Public parks have come to be recognized as not only the natural place for walks and drives afoot, awheel or with horse and carriage, for boating, skating and other outdoor athletics, but also as the appropriate and most effective location for monuments and statues, either to historical heroes or to pure art, fountains, flower displays, botanical and zoological gardens, museums of nature and of art, galeries of painting and sculpture, music stands and *music halls,* and all other agencies of aesthetic enjoyment of eye and ear."

In *New Castle v. Lawrence County,* 353 Pa. 175, 181, 44 A. 2d 589, 593, it was said: "It is common knowledge that municipalities maintain public golf courses in their parks just as they maintain baseball diamonds, tennis courts, and playgrounds equipped with appropriate devices; it is also common knowledge that, frequently, reasonable charges are imposed towards reduction of the general maintenance cost." And it was there held that a public park maintained by a municipality does not lose its exemption from taxation by reason of the fact that park visitors are required to pay reasonable charges for special entertainment, and that this is so whether the city directly or

by licensees furnishes such benefits. The Court stated (p. 182, A. p. 593) in regard to certain amusement enterprises conducted in the park, that the buildings in which they were housed "are part of the park equipment available for the entertainment and refreshment of the public visiting the park, and promote and facilitate the enjoyment of the park for park purposes . . . . No reason has been suggested why park visitors who desire refreshment or special entertainment should not pay reasonable charges for such additional park privileges. If the city directly, instead of by licensees, furnished these benefits it could make a reasonable charge therefor. As it acts in a proprietary capacity, it is immaterial that it finds it more convenient to supply refreshment and entertainment by its licensees."

It is contended by plaintiffs that the generality of the expression "for the use and purpose of establishing on said grounds a Public Park", as contained in Mary E. Schenley's deed, is limited by the language following therein, namely, "and place of free, attractive and healthful resort, and open air recreation for the people of Pittsburgh and the Public . . . ." More particularly it is urged that the word "free" precludes the right of the city or any lessee or licensee thereof to charge admission fees for any entertainment specially provided within the park limits. In our opinion no such import can be ascribed to the word "free", which evidently means merely that the park is to be a place of free resort in the sense that it is to be a public, not a private, park, and, as such, is to be open to the public without charge or hindrance in any respect; it cannot be realistically construed, however, as meaning that, wholly out of keeping with the practice common in the parks of all the large cities both in this country and in Europe, there can be no restaurants or refreshment stands for the sale of food and beverages within the

park, no charge made for admission to zoological or botanical gardens or for the use of the golf course, tennis courts and other extra facilities furnished for physical, intellectual or aesthetic enjoyment. Schenley Park will still remain free to all who wish to enter it, but where special privileges, in addition to the ordinary, natural, "free" use of the park, are granted to those who wish to utilize them, there is no legal reason, nor any inference to be drawn from the terms of the deed of grant, that would compel the necessity either of furnishing such extra facilities, privileges and entertainment "free", or of abolishing them altogether.

Further objections urged by plaintiffs to the legality of the construction of the auditorium and the carrying out of the civic opera project may quite readily be disposed of. There is, in the contemplated arrangement, no pledging or loaning of the city's credit to any individual, corporation or association in violation of Article IX, section 6 of the Constitution of the Commonwealth. The City of Pittsburgh does not appropriate any money to the Civic Light Opera Association, but merely leases the auditorium to it for limited periods at a nominal rental as authorized by the Act of 1919. It is expressly held immune from liability for any deficits that may arise in the course of the conduct of the operatic performances; the only expenses for which it is to be responsible are those required for the repair and maintenance of its own building and property, and even those expenses are to be met by the Opera Association as far as possible from the profits derived from its operations; the decision in the case of *Kulp v. Philadelphia*, 291 Pa. 413, 140 A. 129, upon which plaintiffs largely rely, is therefore wholly inapplicable to the present situation.

The contention that there is involved a violation of Article III, section 20 of the Constitution of the Commonwealth, which provides that "The General As-

sembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, . . . or perform any municipal function whatever," likewise falls in view of the fact that there is here no delegation of authority in connection with the performance of any municipal function, nor any transfer of any of the powers or duties of the city's officers to any special commission or private body. The only municipal function involved is the maintenance and control of the building itself, and that remains entirely and exclusively with the city. It is true that the ordinance authorizing the lease to the Opera Association provides for the establishment of a board consisting of a city official, a representative chosen by the Opera Association, and a third person chosen by both parties, which shall act as an advisory board to resolve questions concerning the program presented, the admission charges, the allocation of maintenance costs, and similar matters that may arise from time to time *in the conduct of the business of the Opera Association,* but these are not matters with which the city is concerned as such. cf. *Poor District Case (No. 1),* 329 Pa. 390, 406, 197 A. 334, 341, 342.

The decree dismissing the bill of complaint is affirmed; the City of Pittsburgh, however, to pay the costs.