LEO T. LANDER AND DORIS LANDER, HIS WIFE, ALBERT LIPOWITZ AND BEATRICE LIPOWITZ, HIS WIFE, AND ESTHER KILDUFF, PLAINTIFFS-APPELLANTS, v. VILLAGE OF SOUTH ORANGE, A MUNICIPAL CORPORATION OF NEW JERSEY, BRIAN D. CONLON, VILLAGE PRESIDENT, AND THE BOARD OF TRUSTEES OF THE VILLAGE OF SOUTH ORANGE, JOSEPH A. ROSENTHAL, CHAIRMAN, AND THE PARKS AND RECREATION COMMITTEE OF THE VILLAGE OF SOUTH ORANGE, DEFENDANTS-RESPONDENTS.

Argued November 24, 1970—Reargued March 9, 1971—Decided June 28, 1971.

*Mr. Eugene Lewis* argued the cause for plaintiffs-appellants.

*Mr. Edward F. Neagle, Jr.* argued the cause for defendants-respondents (*Mr. Donal C. Fox,* attorney).

The opinion of the Court was delivered by

HALL, J. This action in lieu of prerogative writ sought to set aside an ordinance of the governing body of defendant Village of South Orange adopted May 19, 1969, which authorized "the construction of a new swimming pool complex at and in the vicinity of the existing pool in Cameron Field;" appropriated $680,000 to pay for the estimated cost thereof; and authorized the issuance of $630,000 general obligation bonds of the municipality to finance part of that cost. The complaint further asked for a declaratory judgment that the proposed use would violate a deed restriction. The Law Division gave judgment for defendants and we certified plaintiffs' appeal to the Appellate Division on our own motion before argument there. *R.* 2:12–1.

While plaintiffs, who are taxpayers and residents in the vicinity of the proposed pool complex, urged at trial three bases for their suit, only that relating to the deed restriction

is asserted on appeal.[1] The action is grounded on the stipulated fact that 2.38 of the 4.79 acres, upon which the pool complex would be constructed, were conveyed to the village in 1911 by a deed containing the restriction that "the premises herein conveyed are to be used only for the purpose of a *free public play-ground,* and for no other purpose" (emphasis supplied) and on the claim that the village proposes to make charges for use of the new facility, thereby violating the restriction. The pool, parking areas and other accessories thereto will occupy all of the tract covered by the restriction, and more; and will displace existing recreational facilities thereon including, we understand, a present swimming pool, much smaller than that proposed and for the use of which no fee is charged.

Some history is necessary to put the issue raised by this restriction in proper focus. South Orange has had for many years extensive public park and playground areas in a single general location, consisting of both open space and a wide variety of recreational facilities. A portion thereof, the exact extent of which does not appear in the present record, is known as Cameron Field. This portion apparently had its origin in 1909, when a non-profit corporation was formed by a number of distinguished citizens of South Orange, with the expressed purpose "to purchase the necessary lands and equipment and maintain the same in order to provide a play-ground for the children of the Village of South Orange, such play-ground to be known perpetually as

---

[1]The first of the other grounds was that the ordinance action was unreasonable and arbitrary and was taken without proper and full consideration of all the surrounding circumstances. This related primarily to the selection of this site as against several other proposed locations said to be better suited for the facility. The second ground was that the governing body had not first referred the proposed ordinance to the Planning Board for review and recommendation pursuant to *N. J. S. A.* 40:55–1.13. The trial judge found that the first ground was without factual merit and, as to the second, that reference to the Planning Board prior to the adoption of the ordinance was not required because the village's partial master plan did not cover the area involved.

'Cameron Field' in memory of the services of the late Lewis Cameron to the communities of the Oranges."[2] It was that entity which conveyed this 2.38 acre portion of Cameron Field to the village in 1911 with the restriction previously quoted, the deed being signed by Albert C. Wall, a distinguished lawyer in the state, as President.

For some years prior to 1969 there had been community agitation for a larger, modern public pool complex to supplant the existing pool, in line with similar facilities constructed by other municipalities. Various studies and surveys were made under the sponsorship of the governing body by village agencies and retained consultants. After 1967, the exploratory work was carried on principally by the Advisory Board of Parks and Recreation, created by ordinance in that year to "advise, assist and recommend to the Board of Trustees [the governing body] * * * on matters of policy and program and the achieving of an efficient operation of the Department [of Parks and Recreation] * * *." These

[2]The minutes of the June 15, 1914 meeting of the village governing body contain a report by the Board of Playground Commissioners (included as an addendum to plaintiffs' brief in this court) on the ceremony dedicating Cameron Field Playground on the preceding May 30th. The report recites the successful completion of the preparation of the field for public use, with a swimming pool, tennis courts, baseball, football and basketball grounds, grandstand, dressing and shower rooms and playground equipment. It is evident from the necessary size of all these facilities that an area larger than the 2.38 acre piece was encompassed.

The report also made reference to Reverend Lewis Cameron: "It was his conception that there should be provided a public playground for all the children of this village, but preeminently for those of them who would have otherwise no proper opportunity or suitable surroundings for their needed recreations."

The present record does not disclose what deed restrictions, if any, exist with respect to the other portions of South Orange's park and playground areas (including the remainder of Cameron Field and the balance of the 4.79 acre proposed pool complex site). We do know from prior litigation that another segment, not here involved, was conveyed to the village subject only to the restriction that the premises "be used solely for public park and playground purposes." See *Baird v. Board of Recreation Commissioners of the Village of South Orange*, 110 *N. J. Eq.* 603, 605 (E. & A. 1932).

studies dealt with pool size and location, integration and expansion of existing recreational facilities, traffic flow, parking facilities, financing and the like.

The Advisory Board made its final report and recommendation to the governing body just before the ordinance under review was introduced. While there is no reference to any official action approving the report, the governing body must have had it strongly in mind when the ordinance was adopted. The report settled on the Cameron Field site and expressly bottomed its proposal on a self-liquidating facility, as to both capital and maintenance costs, to be financed by annual membership which would produce enough to pay off bonds as they matured, as well as to cover the cost of operation. It recommended a pool to accommodate 1500 families (the number who had given an affirmative response to a previous advance membership campaign), with annual suggested rates of $65 for a family membership, $30 for a single membership and $10 for one for a "senior citizen." The report further recommended the use of donated "swimmerships" and subsidization of fees, out of savings from funds presently allocated to the operation of the existing pool, for families and individuals "who find the membership fee a serious burden," such subsidy to be arranged by individual application to the Director of Parks and Recreation.

The ordinance, however, makes no provision for the imposition of fees or charges for pool use and the municipality has as yet adopted no separate ordinance or rules and regulations to that end. The enactment does, however, describe the proposed pool complex as one "to produce a modern utility capable of accommodating a minimum of 1,500 families" and expresses "the intent of the governing body to seek membership fees sufficient to insure a self-sustaining status for the facility." After the ordinance was introduced and before the required public hearing thereon, a letter was sent to all residents of the village reporting to them, *inter alia,* the recommendation of the Advisory Board that a new pool complex be constructed at the site of the existing pool in

Cameron Field to be completely financed by membership fees. All of this demonstrates that the ordinance was in fact adopted on the assumption that substantial use charges would later be imposed to recoup the entire cost of the project as well as to cover all expenses of maintenance and operation and that the citizens of South Orange so understood.[3]

The trial judge concluded that "the proposal" of the village "to charge an annual membership fee or other type fees for the privilege of using the new swimming pool facilities does not violate the terms of the conveyance that the land be used 'for the purpose of a free public playground.' " (He made no reference to the matter of availability of use to residents unable to afford fees so fixed.) His conclusion was reached on the thesis that both "free" and "public" in the restrictive language meant only "open and accessible to all," presumably on the same terms.

Although the judgment simply dismisses the complaint, the effect, as all parties to the litigation assume, amounts to a declaratory judgment that any future municipal enactment

---

[3] We called to the attention of counsel when the case first came on for argument that there had been no precise municipal action on fees and charges, including the matter of use of the pool by residents unable to afford an annual membership, with the possibility in mind that the governing body might wish to take some definitive action along this line to supplement the record. The argument was continued for the village to consider the matter, as well as for the purpose of enabling counsel to furnish us with further legal authority as to the proper meaning of the "free public" characterization. We were thereafter advised that the governing body decided as a matter of policy, but in executive session and not as an official action, that a regulatory ordinance to be later adopted would also provide for a daily membership fee "at a charge that would be in fair proportion to the seasonal membership and not jeopardize the financial soundness of the undertaking." We take this statement, as well as others in the village's supplemental brief, to express the continued intent of the governing body that the complex is to be operated on a self-liquidating basis and also to indicate that no method has been selected to make the pool available to residents unable to afford the charges fixed on that basis.

fixing use charges on the basis proposed will be valid, insofar as the deed restriction is concerned.

██ Whether a particular restriction will be violated by a proposed use of property dedicated[4] for playground or park purposes depends upon many factors and each case must be decided individually on an evaluation of all the pertinent legal and factual circumstances. These include: the import of the restrictive language, which necessarily encompasses the intent of the grantor; the nature and scope of the proposed use in the light of current approaches to such uses; the state of enabling legislation; and general principles of law that have developed over the years.

██ A fundamental legal principle is that when the dedication is made by a private donor, the terms will be more strictly construed against the governmental grantee than when the property is acquired by government, through purchase or condemnation, for some designated public purpose. 39 *Am. Jur., Parks, Squares and Playgrounds* § 21, p. 817 (1942); *Rhyne, Municipal Law* § 21-4, p. 5 467 (1957); 11 *McQuillin, Municipal Corporations (3rd ed.* revised 1966) § 28.52a, p. 172-173. Seemingly this is only another way of saying that the intent of the donor cannot be disregarded so that the use made of the land will be inconsistent with the purpose of the dedication or substantially interfere with it. However, the law is now clear in this state that a " 'dedicator is presumed to have intended the property to be used by the public, within the limitations of the dedication, in such way as will be most convenient and comfortable and according

---

[4]The word "dedicated" is used in the broad sense. Technically speaking, a gift of land to a municipal corporation by an effective written conveyance is not properly a "dedication" even though the land is conveyed for some particular public use. In such a case the municipal corporation is a grantee and the estate passes by grant rather than by dedication. Cunningham and Tischler, "Dedication of Land in New Jersey," 15 *Rutgers L. Rev.* 377, 380 (1961). Principles of interpretation will not vary greatly, however, whether the public use is created by a deed of conveyance or by dedication in the strict sense.

to not only the properties and usages known at the time of the dedication, but also to those justified by lapse of time and change of conditions.' " *Biglin v. West Orange,* 46 *N. J.* 367, 373 (1966). (This decision in effect overruled the former, more narrow rule, expressed in *Baird v. Board of Recreation Commissioners of the Village of South Orange,* 110 *N. J. Eq.* 603, 605-606 (E. & A. 1932), that " 'public park and playground purposes' * * * must be construed and determined by the definition thereof and character of use contained in legislation existing at the time the covenant was entered into.")

Since *Biglin,* there can no longer be any doubt in this state that the installation and operation of a municipal swimming pool, with substantial use charges computed, as in the instant case, on a membership basis to recoup the capital cost as well as current maintenance expenses, is permissible as a playground facility. The *Biglin* court held that such a use did not violate a quite loose donor's restriction in a 1927 deed that the premises were conveyed "for the use of a playground and as a place of recreation for those living in the neighborhood thereof * * *. (46 *N. J.* at 370). It was pointed out that the proposed pool would occupy less than one-fourth of the conveyed tract. "Playground" and "place of recreation" both connote facilities for sports and physical activities and the opinion stressed the recent emergence of swimming as a major recreational activity for millions of Americans, appealing, it may be added, to all ages and segments of the population. So no difficulty was found in deciding that the donor can be said to have intended use of the property for another activity not common when the property was conveyed to the municipality. The validity of the use charges was found to be expressly authorized by a 1957 statute, now *N. J. S. A.* 40:61-22.21 to 22.29, permitting the construction and operation of municipal pools and use charges therefor on a self-liquidating basis. The court further found such an arrangement to be within the grantor's presumed intent, absent any indication to the contrary, that the town be able

to use all its powers in developing the tract as a playground and place of recreation, including those powers granted by the Legislature subsequent to its dedication. It is to be observed, however, that the deed restriction contained no language that could be said to bear in any way on the donor's intent with respect to charges or fees for the use of any facilities installed on the property.[5]

Indeed, the modern trend of decisions involving the use in urban and suburban areas of land dedicated for parks (which may be thought of as a combination of open space, facilities for physical activities and accommodations for other recreation and entertainment) and playgrounds has been to approve a wide variety of uses as within the dedicated purpose. The cases have also generally sanctioned charges for the use of special facilities therein, absent some contrary restriction, either on a statutory or inherent basis, especially as to uses costly in their installation and upkeep and enjoyed by only a limited portion of the population. Thus, this court in *Hill v. Borough of Collingswood, 9 N. J.* 369 (1952), found power in a county park commission to lease a clubhouse to a private entrepreneur under governmental regulation for a milk bar and to let out the tennis, bicycling and boating concession in the park. Municipal authority along the same line is granted by *N. J. S. A.* 40:61–1, subd. h. Also, a 1945 statute, parallel to the 1957 swimming pool enactment previously referred to, permits construction and operation of a municipal golf course on a self-liquidating fee basis. *N. J. S. A.* 40:61–22.6 to 22.14. Similar decisions in other states are exemplified by the leading cases of *Bernstein v. City of Pittsburgh, 366 Pa.* 200, 77 *A.* 2d 452 (1951), and *Cohen v. Samuel, 367 Pa.* 268, 80 *A.* 2d 732 (1951). In

---

[5]The question was not raised in Biglin, nor, in the view we take of the present case, is it reached here, whether, despite such statutory powers, a municipality might not be required to make a facility as universally appealing as a swimming pool available for use, under some undemeaning method, by those members of the community who cannot afford substantial membership fees.

the former, the court approved construction of an auditorium in Schenley Park and its lease to a non-profit organization for the presentation of light opera and other entertainment on an admission charge basis. The 300 acre park had been conveyed to the city for use as "a Public Park and place of free, attractive and healthful resort, and open air recreation. * * *" In the latter, a license to operate a truncated golf course on a charge basis was found to be within the statutory authority of the Fairmount Park Commissioners. It is well to point out, however, that the court in each case, although it indicated such activities and methods of operation were common in city parks throughout the world, laid considerable stress on the fact that the approved activities would occupy only a very small fraction of the total park areas. See also *Shields v. City of Philadelphia,* 405 *Pa.* 600, 176 *A.* 2d 697 (1962).

Despite this generally broad approach, our courts, like those in other jurisdictions, have been alert to strike down uses that must reasonably and fairly be said to be inconsistent with a restriction imposed by a dedicator or grantor. For example, in *Hill v. Borough of Belmar,* 3 *N. J. Misc.* 254, 127 *A.* 789 (Sup. Ct. 1925), a filed subdivision map designated a portion of the property along the ocean front as a "square" and lots were sold on the representation that this square would remain open with an unobstructed view of the ocean. The municipality had accepted the dedication and the area had been treated by it as a public square or park. The court set aside an ordinance for construction of a swimming pool therein on the ground that such a use was not reconcilable with an open square. Again, in *City of Passaic v. State,* 33 *N. J. Super.* 37 (App. Div. 1954), the state had conveyed lands to the city for "park or street purposes" upon condition that they be kept and maintained "as a public park, street, or place for public use, resort and recreation and that no building or other structures shall be erected" thereon inconsistent with such use. The court held the condition would be broken by the proposed erection of a public housing project

on 19% of the land although the balance would remain in use as a park and streets.

To the same effect is *East Orange v. Board of Water Commissioners,* 41 *N. J.* 6 (1963). There the city had leased public water reserve lands to a non-profit association for the construction and operation of a golf course "for the sole use of the residents of the City of East Orange and their guests." For many years only a small proportion of the association's members were residents of the city and some city residents had been unable to become members. This court found the lease had been breached and affirmed a judgment for forfeiture and ouster. Justice Jacobs commented:

> The purpose of the arrangement was to make an athletic and recreational facility available to East Orange citizens — not just some chosen few of them but all of them. The very phraseology of the lease evidenced the public nature of the arrangement and the fixing of the annual rent at the nominal sum of $1.00 displayed the undoubted understanding that the vital consideration to the city was the public benefit to its citizens as a whole. (41 *N. J.* at 16).

■■ This brings us to a consideration of the rather tight deed restriction here involved — "to be used only for the purpose of a free public play-ground, and for no other purpose." Were it not for this language, the village's use fee scheme might well pass muster under *Biglin, supra* (46 *N. J.* 367) (subject to the question mentioned in footnote (5), *supra),* both on the basis of the swimming pool statute and the inherent right to exact a reasonable charge for special facilities in a public park or playground. Looking first at each of the key words, "free public," it is safe to say that "public" really has only one connotation, *i. e.* open to all, and has no reference to a charge or fee. See *Black's Law Dictionary* 1393, 1394 (*4th ed.* 1951). "Free," on the other hand, is susceptible of several different meanings, depending on the context. It can mean "open to all," but not forbidding charge or compensation — in essence, the same as public. See *In re Peterson's Will,* 186 *Iowa* 75, 172 *N. W.* 206 (1919). This is the view adopted by the trial court and is the basis

of the decision in *Bernstein v. City of Pittsburgh, supra* (77 A. 2d 452), in the light of the factual complex there present. It can also mean "free of charge" to those not able to pay for a facility, but open and subject to charge by those able to pay, as in the case of a "free public hospital." See *Webber Hospital Association v. McKenzie,* 104 *Me.* 320, 71 *A.* 1032 (1908). And it can mean "without any charge," as in the case of a free, as distinct from a toll, bridge or highway or a free school system. See *Bond v. Public Schools of Ann Arbor School District,* 383 *Mich.* 693, 178 *N. W.* 2d 484 (1970); *Paulson v. Minidoka County School District No. 331,* 93 *Idaho* 469, 463 *P.* 2d 935 (1970).

Here we have the two words used not only together but successively. One cannot reasonably think that in this carefully drawn deed identical meanings were intended. What extrinsic evidence there is, which we have previously referred to, indicates the desire of the donor to make this small tract available as a playground for all the children of the village and especially for those who today would be called "underprivileged" and who presumably could not afford to pay to use it. To utilize the whole, as the stipulation of facts sets forth, or substantially all of it for a swimming pool complex available only on a substantial fee basis seems to us to fly in the face of the donor's fundamental intention. The situation is, we think, analogous to that found in the two cases last cited which held that, when "free" and "public" are used together in an enactment relating to schools, charges may not be made for school books or fees exacted for school activities or certifications. We therefore conclude that "free public playground" in this deed restriction must be interpreted to mean a playground open to all without any charge and that the restriction would be violated by a swimming pool complex operated on the premises covered by the deed on a membership fee basis.

This conclusion does not vitiate the ordinance since that enactment contains only a statement of intent and no provision for use charges. It does, however, entitle plaintiffs

to a declaratory judgment to the effect set forth in the last sentence of the preceding paragraph.

The judgment of the Law Division is reversed and the matter remanded to that court for the entry of a judgment pursuant hereto.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL and SCHETTINO—5.

*For affirmance*—None.