**In the Matter of SPECTRUM ARENA, INC., Debtor.**

**No. 30437.**

United States District Court,
E. D. Pennsylvania.

Aug. 9, 1971.

---

Austin Norris, and Germaine Ingram, Philadelphia, Pa., for Trustees in Bankruptcy.

Levy Anderson, City Sol., and John J. Pettit, Jr., Asst. City Sol., for defendant.

HIGGINBOTHAM, District Judge.

## OPINION

On May 1, 1968, the Spectrum Arena, Inc. (hereafter referred to as the "Debtor Corporation"), was involuntarily placed in reorganization under the Bankruptcy Act of July 1, 1898, Chapter 10 (11 U.S.C. § 501 et seq.).

The land and building in which the Debtor Corporation holds a leasehold interest (hereafter referred to as the "Spectrum"), are owned by the City of Philadelphia; the Debtor Corporation is a mere tenant. The terms of the leasehold are set forth in a Construction and Lease Agreement dated May 26, 1966, between the City of Philadelphia and Jerry Wolman. The leasehold interest was assigned by Jerry Wolman to the Debtor Corporation by agreement dated May 31, 1967. In substance, under the Construction and Lease Agreement, the Debtor Corporation as assignee agreed to build the Spectrum Arena at the Debtor Corporation's sole expense, and title to the building would be in the City. Thus, unlike the City's experience with Veteran's Stadium, wherein more than $25,000,000 worth of city bonds [1] were issued to start the Stadium, the Spectrum was built without the city's credit or bonds, but nevertheless the City has title to this building which purportedly cost approximately $8,852,000.00. The City now asserts that the Debtor Corporation, the lessee, should pay real estate tax on the building which the City owns.

On June 1, 1971, Harvey N. Schmidt and William David Webb, the trustees for the Debtor Corporation, filed a petition for tax liability determination, in which they asked this Court to

(1) strike the name of Debtor Corporation from real estate assessments and billings and to withdraw and cancel currently unpaid real estate taxes, interest and penalties for the years 1969, 1970 and 1971, totalling $922,808.75; and

(2) order the City and the Board of Revision of Taxes to cease and discontinue the assessment and levy of real estate taxes against the Debtor Corporation so long as the "property is owned by the City of Philadelphia and used for public purposes." [2]

There are two primary issues facing this Court: [3]

(I) Is the Debtor Corporation's leasehold interest in the Spectrum exempt from real estate taxes because the facility is used for public purposes?

(II) Even if the leasehold interest is exempt from real estate taxes, does the Construction and Lease Agreement of May 26, 1966 nevertheless require the lessee to pay real estate taxes on the Spectrum?

All parties agree that pursuant to the Bankruptcy Act, Chapter 2 (11 U.S.C. § 11(a) (2A)), I have jurisdiction to determine the instant tax issues. After careful consideration of the superbly prepared briefs and the applicable authorities, I conclude that (1) the Debtor Corporation's leasehold interest in the Spectrum is exempt from real estate taxes because of its use for public purposes; and (2) that the Construction and Lease Agreement does not require the Debtor Corporation to pay any alleged real estate taxes.

---

1. For discussion of the original bond issue, see Martin v. City of Philadelphia, 420 Pa. 14, 215 A.2d 894 (1966).

2. See amendment to petition for tax liability determination.

3. The Trustees also claim that the tax assessment is invalid because it lacks uniformity and is too high when compared to the assessments on other properties owned and used for similar public and community purposes. However, all parties agree that it would not be necessary to decide this issue if I found that the property was tax exempt and that by the lease the Debtor Corporation is not obligated to pay such real estate taxes.

## I.

The taxes in dispute were assessed pursuant to the Pennsylvania "General County Assessment Law", Act of May 22, 1933, P.L. 853, 72 P.S. 5020–1 et seq., Section 204 of which provides as follows:

"The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

(g) All other public property used for public purposes, with the ground thereto annexed and necessary for the occupancy and enjoyment of the same, but this shall not be construed to include property otherwise taxable which is owned or held by an agency of the Government of the United States."

The parties have agreed to the following stipulation (see Transcript of July 26, 1971, at p. 10), concerning the function of the Spectrum:

"* * * The Spectrum Arena building and site is a public assembly facility used for professional and amateur sports entertainment, musical concerts and other cultural events, and as a facility for conventions and public assemblies. It is a multipurpose sports, entertainment, and convention facility. The uses include sports such as hockey, basketball, roller derby, track meets, boxing, wrestling, figure skating, and tennis. Extravaganzas such as ice shows, circuses, Walt Disney on Parade, the Moscow Circus, Coldstream Guards, Black Watch, and two precision drill teams. Musical concerts and events, and such miscellaneous events as the Home Show, church and miscellaneous conventions. Except as set forth in the construction and lease agreement and except as under its [the city's] general governmental powers, it is stipulated that the designation and control over the use of the [Spectrum] arena is in the debtor corporation."

The fundamental issue for adjudication is whether the Debtor Corporation satisfies the "public purposes" test of the above quoted statute.

## A. PUBLIC PURPOSE

By providing the public with amusement, pleasure, and entertainment, the municipally owned Spectrum clearly is public property used for public purposes. Many decisions of Pennsylvania courts have similarly characterized facilities comparable to the Spectrum. In Bernstein v. City of Pittsburgh, 366 Pa. 200, 77 A.2d 452 (1951), the court held " * * that the City of Pittsburgh may legally erect an open-air auditorium in Schenley Park and lease it during summer months to a private, non-profit corporation for the presentation by the latter of light opera for which admission charges will be made." (77 A.2d at pp. 453–454). In so holding, the court found that providing the public with " * * * aesthetic recreation and mental and cultural entertainment * * * is commonly recognized and accepted as being within the normal scope and ambit of public park purposes, and an open-air public auditorium comes within the same category as other permissible structures", even though an admission fee is charged. (77 A.2d at p. 455). The Spectrum, in addition to providing the public with musical concerts and cultural events, also provides the public with a wide variety of other entertainment throughout the year.

The Supreme Court in Bernstein v. City of Pittsburgh, *supra*, relied upon its earlier decision in City of New Castle v. Lawrence County, 353 Pa. 175, 44 A.2d 589 (1945). In City of New Castle, *supra*, the court held that two public parks (and associated buildings thereon) maintained by a municipality as a golf course and as an amusement park were used for public purposes and thereby were tax exempt under 72 P.S. § 5020–204(g). The court went on to emphasize that this tax exempt status was unaffected by the city or its licensee charging visitors reasonable fees for refreshments or special entertainment. The Spectrum provides the public with amusement and entertainment, as did the tax exempt park facilities in City of New Castle, *supra*.

In Martin v. City of Philadelphia, 420 Pa. 14, 215 A.2d 894 (1966), a taxpayer sought to enjoin the use of public funds and credit to construct a sports stadium (Veteran's Stadium) which would be leased to private enterprises approximately ten and one-half months of the year. The Supreme Court dismissed the complaint, agreeing with the Chancellor and the lower court that such a stadium would serve public purposes:

> " 'A sports stadium is for the recreation of the public and is hence for a public purpose; for public projects are not confined to providing only the bare bones of municipal life, such as police protection, streets, sewers, light, and water; they may provide gardens, parks, monuments, fountains, libraries, museums, and "Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public. * * *" ' "
> (215 A.2d at 896.)

The Spectrum serves a public purpose similar to that served by the Philadelphia Veteran's Stadium—providing a place for athletic events. However, since the Spectrum is enclosed it is better suited than the Veteran's Stadium for the providing of year round additional cultural and entertainment events.

There is a particular irony in the City's asserting a position as to the tax liability of the Spectrum different from its position concerning the tax liability of the two buildings adjacent to the Spectrum—the John F. Kennedy Stadium and the Veteran's Stadium. All three facilities are served by adjacent parking facilities and the entire complex of land and buildings is owned by the City of Philadelphia; it is admitted that

> "All of the properties comprising [this] complex are devoted to the same purpose, namely public entertainment in the form of sports, musical and cultural events * * * The Veteran's Stadium is leased to a private baseball club for seven months of the year from April to October, and is leased to a private football club from September 15 to January 1. During these times the private clubs have control of the operation of the stadium, and during the remainder of the time the City has control of this operation. The football club and the baseball club charge an admission price to the public * * *."
> (See Transcript of July 26, 1971, at pp. 10–11.)

The Veteran's Stadium, costing $49,000,-000, and financed through the funds, bonds, and credit of the City of Philadelphia, is tax exempt. In contrast, while the Spectrum was built without taxpayer credit or funds, the City urges that the leasehold interest is subject to real estate taxes. While Martin, supra, did not concern the question of exemption from real estate taxes, it should be noted that the only basis suggested to this Court for the tax exemption of Veteran's Stadium is that Veteran's Stadium is a public property used for public purposes and therefore tax exempt by 72 P.S. § 5020–204(g). A Phillies baseball player striking out at the Veteran's Stadium commits no act of higher public purpose than a 76er missing a lay-up shot at the Spectrum. A football game at the John F. Kennedy Stadium has no higher public purpose than Walt Disney On Parade or a hockey game at the Spectrum.[4] Distinctions between Veteran's Stadium and the Spectrum as to the public purposes they serve are distinctions without differences and are not legally justifiable.

The Pennsylvania Supreme Court in Bernstein, supra, and Martin, supra, in deciding that recreational facilities could be developed with public funds, used the same "public purposes" test as did the court in City of New Castle, supra, in deciding whether publicly owned recreational facilities are tax exempt. In any event, it is clear that the Spec-

---

4. The parties also stipulated the following at p. 11 of the Transcript of July 26, 1971: " * * * The Playhouse in the Park is owned by the City of Philadelphia and is used as a facility to provide dramatic and musical entertainment, and is exempt from real estate taxes."

trum serves at least as much of a public purpose as did any of the public facilities in the above cases, and accordingly, the Spectrum is tax exempt by 72 P.S. § 5020–204(g).

The wording used in the Construction and Lease Agreement for the Spectrum lends additional support to my conclusion that the Spectrum is used for public purposes. The third paragraph on the very first page of the Agreement provides as follows:

"Whereas, City believes *that the interest of the public*, of the merchants and other business interests in Philadelphia, and of sports fans in and around Philadelphia *will be best served* by attracting other sporting events in Philadelphia, particularly a new National Hockey League Team and *by providing arena facilities* at the STADIUM SITE for such Hockey Team and for such other sporting and other events as will promote the maximum use of the STADIUM SITE and the parking lot which is a part thereof on a year round basis for the widest possible variety of activities." (Emphasis added.)

This view of the public purpose of the Spectrum was unmistakably adopted by the Philadelphia City Council in passing an ordinance approving the Agreement. Thus, in 1966 when it could get title to a $8,500,000 arena without paying any costs for construction, the City itself made a legislative determination that the Spectrum served public purposes. While such a legislative determination is not conclusive, it is still entitled to great weight. Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834 (1938).

### B. EFFECT OF LEASE

█ Respondents state in their brief (p. 5) that " * * * the private profit motive precludes the operation of the Spectrum from being a public purpose," and contend that the Spectrum is not tax exempt because it is controlled privately instead of by the public. The Pennsylvania cases repudiate such a contention.

After the Supreme Court, in *Martin, supra,* found that the Veteran's Stadium was used for public purposes, it unequivocally approved the "correct and succint" holding of the opinion of the Trial Judge—the Honorable Edmund B. Spaeth, Jr.:

" * * * Even if the ordinance specifically provided that the stadium will be used primarily by privately owned football and baseball clubs, there would be no conflict with the public nature of the stadium, for the City would be entering into the lease, not to engage in the private business of promoting sporting events or leasing buildings (which might be a private, not a public, use), but rather as incident to providing for 'the recreation or the pleasure of the public'." (215 A.2d at 896.)

Thus, the leasing of public facilities to private parties for operation does not negate the public purpose of the facilities.

Public Parking Authority of Pittsburgh v. Board of Property A., etc., 377 Pa. 274, 105 A.2d 165 (1954) concerned properties owned by the Public Parking Authority of Pittsburgh which were leased to private parties for a variety of purposes. Ordinarily, Authorities incorporated under the Parking Authority Law of June 5, 1947, P.S. 458, 53 P.S. § 10271, et seq., are tax exempt, for the public purpose of such Authorities, as expressed in Section 5(a), was to secure "efficient operation of off-street parking facilities, for the fulfillment of public needs in relation to parking," and to establish "a permanent coordinated system of parking facilities * * *," and the *properties* of such Authorities are ordinarily tax exempt under Section 15. Thus, *Public Parking Authority, supra,* started with tax exempt public property leased to private individuals who operated it for their private profit. The threshold question for the Court's determination was whether " * * * the leasing of these properties to private parties who operate them for profit destroy[ed] their tax exempt status?" (105 A.2d 167).

The Court held:

"We are, then, all of opinion that the fact that the properties of the Parking Authority in the present case are leased for operation to private parties deriving profit therefrom instead of being operated by the Authority itself does not, as the court below correctly held, destroy the tax exemption granted them by the Public Authority Law." (105 A.2d 169).

Thus, the Court found that "the determinative question is whether or not these public properties are being used for a public purpose * * *" (105 A. 2d 168). "It is the use of the property and not the use of the proceeds from the property which determines whether tax exemption may constitutionally be granted." (105 A.2d 169). Thus, we must look to whether the use of the property is in furtherance of the purpose of the tax exemption statute concerned.

The Supreme Court in *Public Parking Authority, supra,* relied upon the case of Commonwealth of Pennsylvania, State Employes' Retirement System v. Dauphin County, 335 Pa. 177, 6 A.2d 870 (1939), in which real estate owned by the State Employes' Retirement System which was tax exempt by statute. But there, the Court found that leasing the property to private tenants for rental income did not impair the statutory tax exemption, for the public purpose of the statute was to provide funds for the State Employes' Retirement System.

Here we also have established that there is a statutory tax exemption, and we now look to the effect on that exemption of the leasing of the Spectrum to the Debtor Corporation. The tax exemption arises because of the use of the Spectrum for public purposes—the providing of an arena for public entertainment and amusement. Parking and restaurant facilities are uses incidental to this public purpose and are included in this exemption.[5] The Spectrum serves this public purpose while under the control of the Debtor Corporation. Accordingly, the leasing of the Spectrum to the Debtor Corporation does not negate the status of the Spectrum as tax exempt public property used for public purposes.

It should be stressed that we are not holding that a leasehold interest in public property is always exempt from real estate tax. On the contrary, it is clear that á leasehold interest in publicly owned property can be taxable, as was the case in Appeal of H. K. Porter Company, 421 Pa. 438, 219 A.2d 653 (1966). The City relies heavily upon inferences which purportedly flow from *Porter, supra,* where the Court held that airplane hangars leased from a public authority were taxable. But the facts make the difference as to tax liability. For in *Porter, supra,* a hangar was being used for two company planes which were utilized excusively for executives and employees of Porter. The public had no right to fly in Porter planes or to command their services. Whereas, in the Spectrum there is not merely a right of the public to view the events at the Spectrum, but the public is solicited to utilize the Spectrum's facilities. Not one citizen of Pittsburgh had a right to board the Porter plane, while the Spectrum solicits 15,000 citizens for each event to watch a hockey match, or a basketball game, or a musical session. I am not suggesting that a leasehold interest in public property is never taxable. I am merely holding that a leasehold interest in public property is tax exempt where the property is used for public purposes.

5. This case must be distinguished from that of Public Parking Authority, supra, where the purpose of the tax exemption statute concerned was to provide efficient operation of off-street parking facilities. Public Parking Authority properties used by the lessee as parking lots and garages were held to remain tax exempt because such uses effectuated the public purpose of the parking statute, while properties used by commercial lessees including a restaurant were held to be no longer tax exempt because such uses were not incidental to the public purpose of the parking statute. In this case, restaurant facilities are incidental to the the public purpose of providing the public with amusement and entertainment.

## C. PURELY PUBLIC PURPOSE

My finding that the Spectrum is used for a public purpose so as to be exempt from real estate taxes is not inconsistent with the finding of the Supreme Court of Pennsylvania in American Seating Company v. City of Philadelphia, 434 Pa. 370, 256 A.2d 599 (1969) that the very same Spectrum was not built for a "purely public purpose." The court in *American Seating* was solely concerned with construing Section 1303(b) of the Mechanics' Lien Law giving exemption to materials furnished for a *"purely public purpose,"* and unlike all of the other cases cited, was not concerned with the phrase "public purpose" alone. *American Seating Company*, 256 A.2d at 600–601, relied upon Henry Taylor Lumber Company v. Carnegie Institute, 225 Pa. 486, 74 A. 357 (1909), in which it was held that construction work for a school managed by a private Board of Trustees, although in furtherance of a "public institution," was not done for "purely public purposes' within the meaning of the Mechanics' Lien Law. Thus, the *American Seating* case, dealing with the standard of "purely public purposes" within the context of the Mechanics' Lien Law, does not negate the use of the Spectrum for "public purposes" as that term is used in 72 P.S. § 5020–204(g).

## II.

█ The 13th paragraph of the above-mentioned Construction and Lease Agreement states in part as follows:

" * * * In the event that the Arena or the Arena Site of Tenant's interest therein or in the Parking Lot shall be or become subject to real estate or similar taxes, including without limitation taxes on leasehold interests Tenant shall be responsible for the payment of all such taxes * * *."

Such a provision clearly shifts the responsibility for any valid real estate tax from the lessor to the lessee. But, contrary to the contentions of the City of Philadelphia, the plain meaning of such a clause cannot be construed as creating an initial obligation in the lessee to pay a real estate tax that the lessor was not otherwise subject to. With no real estate tax placed upon the lessor, the clause in question does not create any burden on the Debtor Corporation to pay a real estate tax.[6]

---

6. I would like to commend the able counsel who have litigated this real estate tax issue. The petition was filed on June 1, 1971, and through a series of pretrial conferences and stipulations we were able to process this matter for a prompt determination. This real estate tax issue may be pivotal as to whether the Spectrum can be reorganized, for there are two plans of reorganization now pending, both of which rationally assume that the leasehold interest is not subject to real estate tax liability. Both plans would provide full payment of secured creditors immediately. One plan provides that unsecured creditors would be paid fifty percent upon confirmation of the plan and the balance in four annual installments. Another plan provides that unsecured creditors would be paid twenty percent immediately and the balance in four annual installments. It appears to be highly questionable whether any successful reorganization could take place if the leasehold interest is subject to real estate tax.