**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cleveland Botanical Garden v. Worthington Drewien*, **Slip Opinion No. 2022-Ohio-3706.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3706

CLEVELAND BOTANICAL GARDEN, APPELLEE AND CROSS-APPELLANT, *v.* WORTHINGTON DREWIEN ET AL., APPELLANTS AND CROSS-APPELLEES; THE CITY OF CLEVELAND ET AL., APPELLEES AND CROSS-APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cleveland Botanical Garden v. Worthington Drewien*, **Slip Opinion No. 2022-Ohio-3706.]**

*Real property—R.C. 755.19—Restrictions on conveyance of property for park purposes to a city under a deed of gift—Application of the Marketable Title Act, R.C. 5301.47 et seq., to right of reversion when reversionary interests are original to the root of title—Court of appeals' judgment affirmed.*

(No. 2020-0629—Submitted May 11, 2021—Decided October 20, 2022.)

APPEAL and CROSS-APPEALS from the Court of Appeals for Cuyahoga County, No. 108536, 2020-Ohio-1278.

_____

**BRUNNER, J., announcing the judgment of the court.**

{¶ 1} This matter involves the 1882 transfer of property that is today generally known as Wade Park, located in the city of Cleveland ("the city"). The dispute in this case centers on the interpretation and application of the park-use restrictions in the deed donating the property to the city. This opinion concludes that appellees and cross-appellants, Cleveland Botanical Garden ("CBG"), the city, and University Circle, Inc. ("UCI"), have not violated the park-use restrictions. This court holds that the Marketable Title Act ("MTA"), R.C. 5301.47 et seq., does not extinguish the reverter rights of appellants and cross-appellees, who include seven named heirs, the trustee of the Jeptha H. Wade Trust, and four intervenors (collectively, the "heirs"),[1] but for different reasons than those found by the Eighth District Court of Appeals. For the reasons explained below, the court of appeals' judgment is affirmed.

## I. Background

### A. *The history of Wade Park and Cleveland Botanical Garden*

{¶ 2} Jeptha Wade was a prominent industrialist and philanthropist who was involved in developing the telegraph and was a founder of Case School of Applied Science. Before his death in 1890, Wade donated to the city a 73-acre property, subject to several conditions. The 1882 deed of transfer (the "Wade deed") contained the following language:

> Know all men by these presents that I, Jeptha H. Wade of the
> City of Cleveland County of Cuyahoga, and State of Ohio, being
> desirous of securing to the citizens of Cleveland for all time the

---

1. Appellants and cross-appellees are Staci K. Worthington Drewien, Matthew W. Drewien, Emily Vanderbilt Wade, William Garretson Wade, Donna C. Wade, Randall Hand Wade, Rebecca French Wade Comstock, Richard Comstock, F. Davis Dassori as Trustee of the Jeptha H. Wade Trust, Ann Ruth Worthington, Nathalie Worthington, Irene Wade Sedgwick Briedis, and Emily Love Wade Hughey.

opportunity of re-creating, having, improving and maintaining a beautiful and attractive Public Park therein for the benefit of all the people and being the owner of lands suitable for this purpose situated near the place where several important institutions of learning are about to be permanently located and on which grounds larger expenditures with a view to such a Park have already been made, do hereby freely give, grant, and convey unto the said City of Cleveland and its successors, to have and to hold forever, the following described real property to wit: [property description].

{¶ 3} Wade conveyed the property to the city using the phrase "forever in trust" and required the city, under the direction of the "Park Commissioners," to develop and beautify the park within three years of the conveyance in accordance with a plan approved by him. Through the deed, Wade further restricted the property's use as follows:

> The said grounds at all times thereafter to be kept and maintained by said City in such repair and condition as to make it an attractive and desirable place of resort—as a Public Park to be open at all times to the public. * * * To be used for no other purpose than a Public Park and to be called and known forever by the name Wade Park.

{¶ 4} Finally, Wade reserved a future interest for himself and his heirs through a reversionary clause:

> [I]f the grounds aforesaid or any part thereof shall be perverted or diverted from the public purposes and uses herein expressed, the

said property and every part thereof to revert to me or my heirs forever * * *.

{¶ 5} In the 1930s, CBG, then known as the Garden Center of Greater Cleveland, was founded and was granted permission by the city to use a boathouse on the Wade Park lagoon. In the 1960s, the city and CBG entered into a lease that incorporated the Wade deed's restrictions. The lease required in part two promises from CBG: (1) that CBG would not close off any area of the park and (2) that CBG would not charge admission for entrance to the garden center itself (except for special events). Over the years, the city and CBG entered into other leases for various CBG expansions.

{¶ 6} In 1971, the city entered into a lease with UCI in which UCI assumed the park-maintenance obligations for an area known as Wade Oval. The lease incorporated the Wade deed's park-use restrictions, providing that UCI would only use the property in a manner "consistent with any conditions, restrictions or limitations and covenants contained in [that] deed." CBG then subleased areas of the park from UCI, including in 2001 when CBG subleased an area where it subsequently installed an underground-parking garage.

{¶ 7} After an expansion in 2003, CBG sought permission from the city to modify its lease agreements to permit charging admission. CBG also sought approval from the heirs, which proved to be difficult. While still in the process of identifying the heirs and seeking deeds of release from them, CBG began charging admission for patrons to access its buildings, gardens, and conservatory. Ultimately, CBG and the heirs reached an impasse and CBG failed to obtain all the deeds of release that it sought from the heirs.

{¶ 8} Some of the heirs believed CBG's charging admission and parking fees, restricting access to certain parts of the grounds, and being closed on Mondays violated the Wade deed's restrictions requiring the park to be "open at all times to

4

the public." And some of the heirs viewed CBG's actions as financially benefitting only CBG and leading to the "destruction of Wade Park."

*B. Procedural history*

**{¶ 9}** In 2013, after failing to secure releases from all the heirs and facing legal pressure from individual members of the Wade family, CBG sought a declaratory judgment from the Cuyahoga County Common Pleas Court determining that (1) CBG's use, operation, and maintenance of the property is consistent with the Wade deed's park-use restrictions, (2) CBG may charge admission, and (3) CBG may charge parking fees.[2] CBG named as defendants the interested heirs and beneficiaries of the Wade estate that had not executed deeds of release, along with the city, UCI, and other entities and adjacent property owners having an interest in the outcome of any declaratory judgment rendered by the court. *See* R.C. 2721.12(A) ("[A]ll persons who have or claim any interest that would be affected by the declaration shall be made parties to the action or proceeding").

**{¶ 10}** Additionally, several heirs and beneficiaries who did not execute deeds of release counterclaimed for declaratory judgment in their favor. One heir, William G. Wade, also filed two separate "taxpayer's actions" seeking to enjoin CBG, the city, and UCI from committing violations of the deed restrictions.[3] The heirs did not seek to enforce their reversionary interest in the park property.

**{¶ 11}** A number of defendants consented to a judgment in CBG's favor, and CBG was granted default judgment against several more. And a number of heirs who had previously signed deeds of limited release at CBG's request filed a

---

2. CBG also requested that the court find the fencing restriction in the Wade deed to be a restrictive covenant enforceable only by adjoining property owners. During the trial-court litigation, CBG conceded that portions of the existing fencing were not compliant with the fencing restriction in the deed, and no proposition of law has been posited or accepted for review regarding that issue.

3. The heirs also sought removal of fencing that was noncompliant with the deed.

complaint to intervene in the case. They asserted that the releases they had signed did not contain a proper legal description of the affected property and were intentionally misleading due to this defect.

{¶ 12} The city and UCI counterclaimed for declaratory judgment against CBG, seeking to preserve their rights of cancelation or termination under their lease agreements with CBG if the court found that they were violating any provision of the Wade deed. Various parties moved for dismissal. CBG urged the court to dispose of the heirs' claims by finding that the heirs failed to preserve any reversionary interest they may have in Wade Park as required under the MTA.

{¶ 13} The heirs moved for summary judgment. They argued that the Wade deed created a trust and that the city had violated its fiduciary duties by relinquishing control of the park and not enforcing the deed's park-use restrictions. The heirs also argued that by charging admission and rental fees (for weddings and events), restricting hours of use (10:00 a.m. to 5:00 p.m., Tuesday through Sunday), and being "completely closed off to the public on Mondays and in the evenings after 5:00 p.m.," CBG was violating the deed's provision that the park be "open at all times to the public." The heirs also argued that CBG's charging a fee to park in the underground garage and its marketing of the garage to surrounding institutions violated the deed's park-use restrictions. They urged the trial court to construe the Wade deed's restrictions according to the maps, rules, regulations, leases, and conduct of the parties and to find that CBG had violated the deed's restrictions.

{¶ 14} CBG also moved for summary judgment, arguing that as "one of Cleveland's prized cultural institutions and * * * a leader in the fields of horticultural, botanical and environmental education," its operations were consistent with the Wade deed's requirement that the property be used as a public park. CBG also argued that the Wade deed does not forbid or otherwise mention the charging of admission or parking fees and that the phrase "open at all times to the public" does not equate to "free of charge." Finally, CBG argued that the heirs

were not given policing power or veto power over the Wade deed and that their reversionary interests were extinguished under the MTA.

{¶ 15} In its decision, the trial court stated that "[t]he Wade family's impact on the City of Cleveland is immeasurable and timeless" and that "Jeptha H. Wade's generosity [in donating] Wade Park has been one of the most impactful decisions of any Clevelander since the City was incorporated in 1836." The trial court found the Wade deed to be unambiguous, and it declined to consider the leases, ordinances, or parties' communications in interpreting the deed's restrictions. The trial court interpreted the deed to not only restrict the park's use but also to promote its development, finding that the operation of CBG is a permissible park purpose. The trial court relied in part on caselaw from other states where the operation of botanical gardens has been found to constitute a legitimate park purpose. The trial court further found that the phrase "open at all times to the public" does not mean "free," and it concluded that the Wade deed permits CBG to charge admission and parking fees for purposes of "re-creating, having, improving and maintaining the park."

{¶ 16} The trial court also found that the MTA extinguished the heirs' reverter rights because (1) the city had been the continuous owner of the property since its transfer in 1882, (2) the root of title for purposes of the MTA was the Wade deed, and (3) the heirs' reversionary interest is "inherent in the muniments" of the Wade deed. The court thus concluded that the interest could be preserved only by filing the notice required in R.C. 5301.51. The trial court determined that this was dispositive of the heirs' interest, and it granted summary judgment in CBG's favor.

{¶ 17} The heirs appealed. The Eighth District agreed with the trial court's finding that CBG's operation and practices do not violate the Wade deed's park-use restrictions, but it reversed the trial court's judgment regarding application of the MTA. Citing R.C. 755.19, the appellate court found that Wade Park could not be subject to conventional land-title transactions, because of the special nature of

7

the conveyance—the property's having been gifted to the city to remain a park. The appellate court also found that the city, having been in continuous possession of the property, had notice of the heirs' interest. 2020-Ohio-1278, 153 N.E.3d 700, ¶ 45.

{¶ 18} This court accepted the heirs' appeal to consider the following proposition of law:

> By accepting a conditional gift of property *"forever in trust"* from a private donor who conditioned the grant on use of the property as a *"Public Park * * * for the benefit of all the people" * * * "open at all times to the public,"* a municipal corporation becomes a trustee to the public beneficiaries and may not thereafter abdicate its fiduciary duty to protect the public's interest by ceding use and control of park property to a private entity that prohibits public access for 75 percent of the time so it can generate revenues to fund uniquely private purposes.

(Emphasis and ellipses sic.) *See* 159 Ohio St.3d 1486, 2020-Ohio-4232, 151 N.E.3d 635.

{¶ 19} CBG, the city, and UCI all cross-appealed, and this court accepted their appeals to consider the following propositions of law:

> 1. The Marketable Title Act operates to extinguish, as a matter of law, possibilities of reverter and rights of entry that exist not only prior to the root of title, but also in the root of title, unless a party seeking to enforce such interest has recorded a notice of preservation of interest in accordance with R.C. 5301.51. *See* R.C. 5301.49(A).

8

2. The Marketable Title Act applies to public park property, and a municipality that owns public park property in fee simple is only required to manage and administer the park property in accordance with the provisions or conditions of the granting deed.

3. Under the Marketable Title Act, the only means for a holder of a possibility of reverter or right of entry to preserve such interest is by recording a notice under R.C. 5301.51, and it is only a "record owner" and a party with a present "possessory interest" in property that can invoke R.C. 5301.51(B)'s "continuous possession" exception to R.C. 5301.51(A)'s notice of preservation requirement.

*See* 2020-Ohio-4232.

{¶ 20} For the reasons that follow, this opinion affirms the judgment of the Eighth District.

## II. Analysis

{¶ 21} The material facts of this case are not in dispute, and this court reviews legal questions de novo. *See Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 163 Ohio St.3d 337, 2020-Ohio-5371, 170 N.E.3d 768, ¶ 37.

### A. Park-use restrictions

{¶ 22} The heirs' proposition of law asks us to find that the Wade deed created a trust, that the city serves as the trust's fiduciary, and that the city has breached its fiduciary duties by allowing Wade Park to be closed "75 percent of the time so it can generate revenues to fund uniquely private purposes." The trial and appellate courts looked only to the "four corners of the deed" in their analyses, declining to adopt the charitable- and public-trust theories asserted by the heirs. In discerning Wade's intent, the courts below found the deed to be clear and unambiguous. We agree.

9

**{¶ 23}** Wade clearly intended for the property to be used as a park, not just an open and undeveloped swath of nature. He required the city to develop the property to be an "attractive and desirable place of resort." He recognized that the park would be an anchor for learning and culture and noted that it was a suitable property "situated near the place where several important institutions of learning [were] about to be located." As set forth in his deed to the city, Wade specifically intended for the park to be subject to "rules and regulations" that are obviously necessary to maintain it in the condition he envisioned.

**{¶ 24}** To construe Wade's intent in the manner argued by the heirs, one has to strain Wade's words, interpret sources outside the four corners of the deed, and nearly suspend the practical realities of operating Wade Park. The city cannot be required to "maintain a beautiful and attractive park" and at the same time permit "all of the people" to freely access all parts of the park at all times. The heirs' literal interpretation of Wade's words would require the city to seek permission from all the heirs if it needed to cordon off parts of the park for maintenance or close a restroom for cleaning or if it wished to allow a community bake sale. This opinion thus agrees with the trial and appellate courts' analyses and conclusions that CBG's operation of facilities, buildings, gardens, and a parking garage, and its charging fees to maintain those operations, is consistent with the terms of the Wade deed.[4]

---

4. The trial and appellate courts relied in part on cases from a number of other states where the courts examined whether certain institutions or activities are consistent with the operation of a public park. Those cases are persuasive. *See, e.g.*, *McLauthin v. Denver*, 131 Colo. 222, 227, 280 P.2d 1103 (1955) (holding that the installation of a swimming pool and a bathhouse in a public park, for public use, was a permissible park purpose); *Bernstein v. Pittsburgh*, 366 Pa. 200, 206-208, 77 A.2d 452 (1951) (permitting the city to build an open-air auditorium on land conveyed for park purposes); *Moore v. Valley Garden Ctr.*, 66 Ariz. 209, 212-213, 185 P.2d 998 (1947) (permitting the city to lease park property to a garden club, which was deemed a recreational purpose); *Furlong v. S. Park Commrs.*, 320 Ill. 507, 511, 151 N.E. 510 (1926) (permitting the county to erect a fine-arts building in an area designated as a park district); *Spires v. Los Angeles*, 150 Cal. 64, 66, 87 P. 1026 (1906) (permitting the city to erect a public library on lands dedicated for a public park); *Save Our Heritage Org. v. San Diego*, 237 Cal.App.4th 163, 190, 187 Cal.Rptr.3d 754 (2015) (permitting the city to construct a pay-parking lot within an area dedicated as public space); *Mansour v. Monroe*, 767 N.Y.S.2d 341, 342, 1 A.D.3d 976 (2003) (permitting the county to lease park property for a drive-

**{¶ 25}** The heirs seek a legal conclusion that Wade created a trust through his deed of gift conveying Wade Park to the city. But the terms of the Wade deed conveying the land for use as a park make this unnecessary. R.C. 755.19 states:

> In any municipal corporation which is the *owner or trustee* of property for park purposes, or of funds to be used in connection therewith, by deed of gift, devise, or bequest, such property or funds shall be managed and administered in accordance with the provisions or conditions of such deed of gift, devise, or bequest.

(Emphasis added). This opinion is in agreement with the heirs that R.C. 755.19 requires the city to comply with the terms of the deed, but not because the city is the park's *trustee*—rather, because the city is its *owner*.

**{¶ 26}** There may be conveyances of property to be used for park purposes under which the donor intends for there to be greater oversight of the park's administration. Notably, R.C. 755.20 and 755.21 (neither of which was cited by the heirs) require that a board of park trustees be empaneled to make decisions concerning property that is donated to a municipality for park purposes when the deed of gift specifically requires decision-making approval from an advisory committee. Even under these circumstances, R.C. 755.19 does not expressly transform a deed of gift into a trust.

---

through holiday-lights display and charge per-vehicle admission); *Abbot Kinney Co. v. Los Angeles*, 223 Cal.App.2d 668, 674, 36 Cal.Rptr. 113 (1963) (reversionary-interest holders were not entitled to relief when the city erected a parking lot in an area designated for use as a "pleasure park or beach"); *Saska v. Metro. Museum of Art*, 53 Misc.3d 1212 (N.Y.Sup.Ct.2016) (among other things, museum did not violate a public trust by charging a nominal admission fee and was serving a proper park purpose); *Cleveland Museum of Art v. Cleveland Museum of Natural History*, Cuyahoga C.P. No. CV-04-548373 (May 26, 2005) (operating a museum deemed consistent with the Wade deed's park-use restriction).

{¶ 27} Wade, in his deed to the city, specifically required that the initial improvement of the property that was to be maintained as a park be approved by him, carried out under the direction of the "Park Commissioners," and thereafter that the park be "kept and maintained" by the city. And while Wade may have intended for the city to act symbolically as a trustee for the park, he used language of transfer—"freely give, grant, and convey"—rather than language tending to demonstrate the creation of a trust—"have, hold, and administer." *See Walton v. Red Bluff*, 2 Cal.App.4th 117, 125, 3 Cal.Rptr.2d 275 (1991) (finding the grantor's use of the word "trust" was meant to impart the "solemnity of the grant" and did not override the language of conveyance). The reversionary clause is another indication that Wade intended to convey the property subject to conditions and did not intend to create a trust. *See* Restatement of the Law 2d, Trusts, Section 11, Comment a (1959) ("The owner of property may transfer it * * * and provide that if the [transferee] should fail to perform a specified act his interest should be forfeited. In such a case the interest of the transferee is subject to a condition subsequent and is not held in trust"). Therefore, this opinion rejects the notion that the Wade deed or R.C. 755.19 requires us to hold that the city is subject to a heightened fiduciary duty in this context.

{¶ 28} Finally, the heirs make several arguments that essentially portray CBG, the city, and UCI as conspiring to monetarily benefit from Wade's generosity while all but destroying his intent. We decline to consider these arguments in this opinion, as they stem from the charitable- and public-trust notions advocated by the heirs and would require impossible and unintended standards to be imposed on the city. Moreover, those arguments are not material to or dispositive of the issues before us.

*B. Application of the Marketable Title Act*

{¶ 29} CBG, the city, and UCI challenge the appellate court's reversal of the trial court's judgment on the application of the MTA. At issue is whether the

notice requirements of the MTA preclude the heirs from asserting their reversionary interest under the Wade deed. As an initial matter, the heirs never sought reversion of the property. CBG raised the argument for the purpose of obtaining a declaratory judgment that any reversionary interest was extinguished, thus negating the necessity of consulting with the heirs in the future.

{¶ 30} The purpose of the MTA is to simplify and facilitate land-title transactions. R.C. 5301.55. A person "who has an unbroken chain of title of record to any interest in land for forty years or more, has a marketable record title to such interest." R.C. 5301.48. "Marketable record title," which is what CBG sought in its declaratory-judgment action, is defined as "a title of record * * *, which operates to extinguish such interests and claims, existing prior to the effective date of the root of title." R.C. 5301.47(A). However, "interests and defects which are inherent in the muniments of which such chain of record title is formed" are preserved so long as they are specifically referenced. R.C. 5301.49; *see also Blackstone v. Moore*, 155 Ohio St.3d 448, 2018-Ohio-4959, 122 N.E.3d 132, ¶ 12-15. The "root of title" is "that conveyance or other title transaction in the chain of title of a person * * * which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined." R.C. 5301.47(E). The root of title in this case is the Wade deed.

{¶ 31} The heirs' reversionary interest is contained *in* the instrument that is the root of title. But the MTA does not extinguish an interest contained in the root of title; it provides only that interests and claims "existing *prior to* the effective date of the root of title" may be extinguished. (Emphasis added.) R.C. 5301.47(A); *see also West v. Bode*, 162 Ohio St.3d 293, 2020-Ohio-5473, 165 N.E.2d 298, ¶ 16 (the MTA extinguishes preexisting interests) The purpose of the MTA is to simplify and facilitate land-title transactions by extinguishing "ancient interests" unless they have been specifically preserved. *Erickson v. Morrison*, 165 Ohio St.3d 76, 2021-Ohio-746, 176 N.E.3d 1, ¶ 30, quoting Smith, *The New Marketable Title Act*, 22

Ohio St.L.J. 712, 717 (1961). Therefore, interests appearing in the root of title itself, such as the heirs' reversionary interest in Wade Park by virtue of the Wade deed, cannot be extinguished under the MTA.

{¶ 32} CBG, the city, and UCI argue that R.C. 5301.49(A) creates a separate method for preserving reversionary interests and that that method should apply to interests contained in the root of title. They argue that the method created under R.C. 5301.49(A) requires the recording of a separate notice in the county or counties where the subject property is located. *See* R.C. 5301.51 and 5301.52. But requiring such a recording would be redundant and futile since the reversionary interest is inherent in the root of title itself. *See Gebbie v. Efros*, 95 Ohio St. 215, 223, 116 N.E. 31 (1917) ("The law does not require a useless act"). Requiring the filing of a separate notice would run contrary to the balance achieved by the MTA, wherein the longstanding rights of private-property owners protected by Article I, Sections 1 and 19 of the Ohio Constitution are weighed against the public interest in effectuating simplified land-title transactions. *Erickson* at ¶ 33. The resulting balancing of interests under the MTA leads us to agree with the Eighth District's conclusion that CBG has had notice of the heirs' reversionary interest from the time the Wade property was gifted to the city in 1882, and therefore, the MTA could not be used to extinguish such an interest.

{¶ 33} However, the Eighth District broadly stated that property donated to a municipality to be used for park purposes could never be subject to record marketable title, holding that Wade's gift was not a "conventional 'land title transaction[]' " that would be "the general subject of the Marketable Title Act as stated in R.C. 5301.55." 2020-Ohio-1278, 153 N.E.3d 700, at ¶ 45. This court finds nothing in R.C. 5301.55 that exempts "unconventional land-title transactions" from the MTA, nor is that term defined anywhere in the MTA. R.C. 5301.53 lists certain property interests that may not be extinguished under the MTA, including public-utility or railroad easements, clearly observable easements, and federal-,

state-, and political-subdivision interests. The interest sought to be extinguished in this matter is a private right of reversion, which does not qualify as an exception to the MTA listed in R.C. 5301.53, nor does the existence of the heirs' reversionary interest under the Wade deed transform the deed into anything unconventional. Accordingly, this court declines to hold that the heirs' right of reversion under the Wade deed is of such character to be one of the statutory exceptions to the application of the MTA. This court holds that the MTA may not be used to extinguish the heirs' interests, because those interests are original to the root of title.

### III. Conclusion

{¶ 34} For these reasons, the judgment of the court of appeals is affirmed, albeit on different grounds.

Judgment affirmed.

O'CONNOR, C.J., and DONNELLY, J., concur.

DEWINE, J., concurs in judgment only, with an opinion joined by KENNEDY, J.

STEWART, J., concurs in judgment only.

FISCHER, J., concurs in part and dissents in part, with an opinion.

─────────────────

**DEWINE, J., concurring in judgment only.**

{¶ 35} In 1882, Jeptha H. Wade gave the city of Cleveland 73 acres of land for "a Public Park, to be open at all times to the public." Today, part of that property is maintained by a private entity known as the Cleveland Botanical Garden. The main question before the court is whether this use is consistent with the terms of Wade's conveyance to the city.

{¶ 36} The lead opinion concludes that the restrictions in Wade's deed have not been violated, but it does so with little actual analysis of the deed language. Instead, it predicates its holding largely on public policy, worrying that a literal

15

interpretation of the deed would "nearly suspend the practical realities of operating Wade Park." Lead opinion, ¶ 24

{¶ 37} I agree with the lead opinion's conclusion that the deed restrictions have not been violated, but not with its analytical approach. In my view, a plain reading of the deed establishes that the current use of the property does not violate its terms. Furthermore, a look back at the earliest days of Wade Park reinforces that a plain reading of the deed is the best reading. So, I join the judgment of the lead opinion, but not its reasoning.

## I. The current use of the property does not violate the plain language of the deed

{¶ 38} The deed provides that the "grounds at all times [are] to be kept and maintained by said City in such repair and condition as to make it an attractive and desirable place of resort *as a Public Park, to be open at all times to the public*." (Emphasis supplied.) The Wade heirs contend that the botanical garden does not comport with these requirements because access to the garden is limited by physical barriers, because admission fees are charged, and because the botanical garden is open only at certain times. I take up each of these restrictions in turn. In construing the Wade grant, we look first to the four corners of the deed and consider extrinsic materials only to clarify ambiguities. *Koprivec v. Rails-To-Trails of Wayne Cty.*, 153 Ohio St.3d 137, 2018-Ohio-465, 102 N.E.3d 444, ¶ 23.

*A. The deed does not require unrestricted egress and ingress to the park*

{¶ 39} Start with the question whether the fencing around the botanical garden violates the deed restrictions. The Wade heirs do not dispute that the use of part of the property as a botanical garden is consistent with the requirement that the property be used "for no other purpose than a public park." But they contend that cordoning off access to the garden violates the injunction that the property must be "open * * * to the public."

16

{¶ 40} Dictionaries from Wade's era—like modern dictionaries—ascribe multiple meanings to the word "open." A leading dictionary of the age defined the adjective in these pertinent ways: "1. Free of access; not shut up; not closed; affording unobstructed ingress or egress; not impending or obstructing motion; also, sometimes, not locked up, or covered over"; and "2. Free to be used, employed, enjoyed, visited, read, or the like; not private; public; unrestricted in use; liable to the approach of any one; exposed; as, an * * * *open* library, museum, court, or other assembly." (Emphasis in original.) Chauncey A. Goodrich and Noah Porter, *Dr. Webster's Complete Dictionary of the English Language* 913 (1864). Joseph Worcester published another prominent dictionary of the era. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 421 (2012). Worcester's dictionary provided definitions of "open" that are similar to *Dr. Webster's*: "1. Unclosed, uncovered, separated, unobstructed, or divided, so as to afford an entrance, passage, or view"; "2. Expanded; extended"; and "7. Free or accessible to all; allowed; unrestricted." *A Dictionary of the English Language* 993 (1875).

{¶ 41} These definitions suggest two possible senses in which something like a park might be open. The first sense (represented by *Dr. Webster's* and Worcester's first definitions) connotes no limitations on ingress and egress. In this sense, we might refer to the open range, the open seas, or an open tract of land. The second sense (*Dr. Webster's* second and Worcester's seventh definitions) is directed not at physical restrictions on ingress and egress, but rather, at restrictions on who may enter or enjoy something. In this sense, we might refer to a school with "open enrollment" or the U.S. "Open" golf tournament for which anyone who plays well enough may qualify or a store that is "open" to the public.

{¶ 42} So the question is: did Wade mean for the park to be "open * * * to the public" in the sense that there could be no limitations on ingress or egress, or did he mean it in the sense that a public library or museum is open to the public?

Context establishes that he meant the latter. The deed does not simply specify that the property shall be open; it specifies that the park shall be "open * * * to the public" "as a Public Park."

{¶ 43} A public park parallels closely the public library and museum referenced in *Dr. Webster's* second definition. Indeed, Wade's Gilded Age saw notable philanthropic gifts of all three. Think of the nearly 1,800 libraries financed by industrialist Dale Carnegie, or how the last quarter of the 19th century "witnessed a veritable explosion of art museum construction in midwestern cities"—Columbus, Chicago, St. Louis, Cincinnati, Detroit, Milwaukee, and Minneapolis—all with major philanthropist benefactors. Christa Adams, *"Splendid and Remarkable Progress" in the Midwest: Assessing the Emergence and Social Impact of Regional Art Museums, 1875-1925*, 7 Middle W.Rev. 85, 88 (2020). Though access to these museums was not generally free, "activists and donors in * * * midwestern cities endeavored to build * * * art museums to edify and attract members of the public." *Id.* at 86, 90. In the same spirit, when the Cleveland Museum of Art opened at Wade Park in 1916, its president proclaimed that the museum is "to be forever maintained for the benefit of the public." Hon. William B. Sanders, *The Inauguration*, The Bulletin of the Cleveland Museum of Art (July 1916) 3. Understood in this sense, to say that Wade Park shall be open to the public means simply that it is to remain "accessible to all" in the same way that anyone can visit a public museum or library.

{¶ 44} This reading comports with additional provisions of the deed. For example, it's highly doubtful that Wade meant "open" in the "not closed; affording unobstructed ingress or egress" sense, *Dr. Webster's* at 993, because in the deed's next sentence he granted "free ingress and egress" as a *special privilege* to "abutting landowners." So free ingress and egress cannot be what Wade meant to confer "to the public." Further, the Wade deed provides that "[i]f fencing shall ever be placed on said Park grounds, except along the westerly and southerly boundary, it shall be

open wrought iron fence." Thus, Wade specifically envisioned that access to the park could be restricted.

**{¶ 45}** Thus, the best reading of "open * * * to the public" is that Wade intended for all comers to be able to enjoy the land always, that the park is to be "liable to the approach of any one," *Dr. Webster's* at 913, and "accessible to all," *A Dictionary of the English Language* at 993. The park must be open to all much as a "library, museum, court, or other assembly" would be, *Dr. Webster's* at 913. So the fact that access to the botanical garden is limited by fencing and other physical barriers does not violate the deed restrictions.

*B. Admission fees do not violate the deed restrictions*

**{¶ 46}** Nor do admission fees violate the deed restrictions. Looking to the same definition of "open," the requirement that the park be open to the public means that any member of the public may visit the park. Nothing in the deed suggests that charging an entry fee renders the botanical garden less open to the public. Usage fees are the norm for tollways, public transit, and fairgrounds, yet all are open to the public.

**{¶ 47}** Indeed, if Wade had intended all park amenities to be free of charge, he could have easily said so. "Free and open to the public" is common phrasing both today and in Wade's era. At Schenley Park in Pittsburgh, for example, Andrew Carnegie (Wade's peer) donated money in 1890 to build the Carnegie Free Library, which contains a "library and reading rooms in the building" that by city ordinance "are *open to the public free of charge*." (Emphasis supplied.) *See Laird v. Pittsburgh*, 205 Pa. 1, 4, 54 A. 324 (1903) (recounting the lower court's factual findings). Similarly, in 1816, Pittsburgh City Council dedicated its wharves for public use and decreed that they would be free and open to the public. *See Pittsburgh v. Grier*, 22 Pa. 54, 63 (1853). Or look no further than the 1891 deed of land for the Cleveland Art Museum, wherein Wade's grandson and heir, Jeptha H. Wade II, stated that the museum "was to provide free admission 'for the benefit of

all the people forever.' " The Cleveland Museum of Art, *Landscape Master Plan* 36 (Dec. 2018), quoting the 1891 Wade II deed, available at https://www.clevelandart.org/documents/other/cma-landscape-master-plan (accessed Sept. 29, 2022) [https://perma.cc/K77M-6ZV6]. Plainly, then, had Wade meant to decree that access to all parts of Wade Park should forever be "free" of charge, one would have expected him to say so.

{¶ 48} The deed does not mandate free entry, and no party has suggested that the cost of admission renders the botanical garden inaccessible. Entry fees and fencing are alike in that respect. Both limit *how* a member of the public may enter (through a gate, with a ticket), but neither regulate *who* may enter—anyone may enjoy the garden. Even though fencing limits the number of entry points, the botanical garden remains publicly accessible. Thus, the requirement that one must pay an admission fee to enter the botanical garden does not violate the deed restrictions.

### C. Hours of operation do not violate the deed restrictions

{¶ 49} A closer question is whether the botanical garden's hours of operation are consistent with the deed's stipulation that the park be "open at all times." The garden is open every day from ten in the morning until five at night, except Mondays. By the Wade heirs' calculation, that amounts roughly to one quarter of the hours in a year—a fraction well short of *all* the time. But that hyperliteral reading of "at all times" is not the best one.

{¶ 50} Observe that this phrase is twice repeated in a sentence that provides conditions under which Wade granted the deed: "the said grounds *at all times* thereafter to be kept and maintained by said City in such repair and condition as to make it an attractive and desirable place of resort as a Public Park, to be open *at all times* to the public." (Emphasis supplied.) "A word or phrase" repeated in a document presumptively "bear[s] the same meaning throughout," unless context indicates inconsistent usage. Scalia & Garner, *Reading Law* at 170.

20

{¶ 51} The meaning of the first use of "at all times" is clear when read in context: "at all times" refers to the perpetual nature of the grant of the property. Put another way, the city must forever do what is necessary to maintain the grounds as a public park. Thus, when used later in the same sentence, the requirement that the land be a public park "open at all times to the public," conveys a similar meaning. The city must forever hold the land open to the public as a park.

{¶ 52} The phrase "at all times" does not necessarily mean 24 hours a day, seven days a week. If we say that a golf course is open at all times to the public, we don't mean that any member of the public is entitled to play a round of golf at 3:00 a.m. Instead, what we mean is that during the regular hours in which the course is open, any member of the public may play.

{¶ 53} Indeed, one can find many usages of "at all times" from the 19th century that don't require something to be accessible 24 hours a day, seven days a week. An 1891 thesaurus listed the phrase "at all times" under the words "always" and "forever," alongside these other synonyms: "perpetually," "continually," and "to the end of time." Richard Soule, *A Dictionary of English Synonymes and Synonymous or Parallel Expressions* 18, 175-176 (New Ed.Rev.1891). Usages from that era reinforce the point. In 1868, for example, North Carolina added to its Constitution that its superior courts "shall be, *at all times*, open for the transaction of all business within their jurisdiction." (Emphasis supplied.) Article IV, Section 28 (repealed 1970). Closer to home, when the Ohio General Assembly incorporated by enactment the Eagle Insurance Company of Cincinnati in 1850, the legislation required the firm's president and directors to keep "correct entries of their transactions, which shall be at all times open to the inspection of the stockholders." 48 Ohio Laws 498, 501 (1850); *see also Eagle Ins. Co. of Cincinnati v. Ohio*, 153 U.S. 446, 453, 14 S.Ct. 868, 38 L.Ed. 778 (1894). Or consider Kansas's Registration Act of 1879, which required electors to register to vote in a poll book and state officials to maintain a "full registry of all persons entitled to

vote." *Kansas v. Bush*, 47 Kan. 201, 204, 27 P. 834 (1891). The Act further required the poll books' custodians to keep the books "open at all times during the year, except for 10 days preceding the election," *id.*, but, the Kansas Supreme Court explained in 1891, "it [would] not be contended that the clerk must keep them open during the night-time," *id.* The same logic, of course, applied to North Carolina's superior courts and to Eagle Insurance Company's transaction logs—"at all times" did not necessarily mean every second. And so it is for Wade's deed.

{¶ 54} Furthermore, in granting adjacent landowners a right of ingress and egress, Wade's deed specified that this right would be subject to "rules and regulations prescribed by the Park Commissioners." Thus, Wade specifically contemplated that the Park Commissioners could make rules and regulations about the use of the park. And in the 19th century, like today, it was understood that park authorities could limit the hours of operation of a public park. *See Avondale Land Co. v. Avondale*, 111 Ala. 523, 528, 21 So. 318 (1895) ("the gates were closed and locked at night, a practice or regulation not at all unusual in respect of public parks").

{¶ 55} Thus, the garden's having hours of operation does not violate the plain language of the deed grant. The phrase "as a Public Park, to be open at all times to the public," when read as a whole, is best understood to describe a leisurely setting that is forever accessible by all and never private or exclusive.

## II. The history of Wade Park augments the plain language of the deed

{¶ 56} It is not necessary to go beyond the plain language of the deed to determine that the challenged uses do not violate the deed restrictions. But if the reader has lingering doubts, a look at the history of Wade Park in the early years following the grant should remove such doubts.

{¶ 57} The "interpretation of the parties themselves," as demonstrated by "their subsequent acts or conduct * * * under a deed[,] is entitled to great, if not controlling, influence" on its meaning. 23 American Jurisprudence 2d, Deeds,

22

Section 208, at 227 (2013); *see also* 26A Corpus Juris Secundum, Deeds, Section 192, at 238 (2020) ("How the parties act, as a practical matter, is a guide to interpreting a deed"); *Brown v. Washington*, 130 Wash.2d 430, 438, 924 P.2d 908 (1996) ("In addition to the language of the deed, we will also look at the * * * subsequent conduct of the parties"); *O'Connor v. United States*, 479 U.S. 27, 33, 107 S.Ct. 347, 93 L.Ed.2d 206 (1986) ("the course of conduct of parties to any contract[] is evidence of its meaning"). Indeed, in their merit brief, the Wade heirs specifically invite consideration of the postdeed course of conduct. Looking there, I find a wellspring of park history that decisively favors the botanical garden.

{¶ 58} Ever the philanthropist, Wade gifted his land "for the benefit of all the people." The advent of Wade Park in Cleveland came as part of a national trend in the late 19th century toward beautifying and purifying the urban centers of metropolitan cities. Writing in the Sunday edition of the *Minneapolis Tribune*, a park enthusiast exclaimed that "[p]ublic parks have come to be recognized as institutions essential to the health * * *. To keep down the death rate and be rid of wasting diseases, a plentiful supply of parks is needed in every large town." *Give Us A Park*, Minneapolis Tribune (May 23, 1880) 4. Wade Park afforded Clevelanders the "opportunity of re-creating, having, improving, and maintaining a beautiful and attractive Public Park." As intended, a "great number of visitors * * * found pleasure and recreation within its boundaries." *Report of Park Commissioners*, Reports of the Departments of the Government of the City of Cleveland for the Year Ending December 31, 1882 (Jan. 1, 1883) 245. Right away, "Wade Park had become recognized as one of the choicest spots in the city." *Id.* at 244.

{¶ 59} To go along with the land, Wade also deeded to the city 14 deer, which became an instant attraction. *Cleveland Metroparks Zoo: A History to 2007*, at 2, available at https://resourcelibrary.clemetzoo.com/Document/99 (accessed Sept. 29, 2022) [https://perma.cc/VFH6-K3WH]. Just as Central Park was the site

of New York City's first zoo, *see* New York City Department of Parks & Recreation, *History of Central Park Zoos*, available at https://www.nycgovparks.org/about/history/zoos/central-park-zoo (accessed Sept. 29, 2022) [https://perma.cc/4UGG-FG9Q], Wade Park came to be "the birthplace of the first zoological park in the Forest City," *Cleveland Metroparks Zoo* at 2. In 1893, the city constructed a "zoo building"—"considered one of the outstanding architectural wonders in its day"—to house the deer. *Id.* at 2. The zookeeper kept his quarters upstairs. *Id.* The zoo immediately drew thousands of guests to the park. *Id.* (estimating 5,000 visitors in a single day). As anticipated in the Wade deed, "improve[ments]" would become necessary to accommodate the new park's immediate popularity. By 1888, "a number of animal cages and enclosures" had been built at Wade Park to house the zoo's growing inventory of wildlife—black bears, catamounts, alligators, a Bengal tiger, and prairie dogs—with monkeys and birds soon to arrive. *Id.*; *see also* Appendix.

{¶ 60} One such improvement was the so-called "Octagon building," home to fish, tropical animals, and birds. Twentieth Annual Report of the Park Commissioners of the City of Cleveland 26-27 (1890). Once completed in 1889, the Octagon building "was thrown open to the public" and "visited by thousands of" guests. *Id.* at 26. The Octagon building touted "outer walls" that were "arranged to open up" during the day, "thus affording a view of the animals from the outside." *Id.* at 27. Notably, however, the zoo did not institute its first admission fee ($0.25) until the 1950s, long after the zoo had relocated to its current Brookside Park location. *See Cleveland Metroparks Zoo* at 14.

{¶ 61} The zoo was Wade Park's main attraction, but far from its only one. The park operated and profited from a boat house, picnic grounds, and a restaurant. Twentieth Annual Report of the Park Commissioners, at 25. For $800 or $900 a year, the city leased the boat house to a private firm that in the summer rented its fleet of 20 boats to the public for use on the miniature lake at Wade Park. *Id.* at 27-

24

28. In one episode, a special committee was "appointed to investigate by what right boats [were] let out for hire in Wade [P]ark." *Boat Hire in Wade Park*, The Plain Dealer (July 15, 1888) 9. The committee determined that the park commissioners were probably authorized to contract out the right to sell the use of the boats. *Id.*

{¶ 62} In the summer, hundreds of groups would gather in a picnic area suited for luncheons and parties. *See* Twentieth Annual Report of the Park Commissioners, at 28-29. Justified by "protect[ing] the picnic[k]er," the Park Commissioners "required a permit to be issued to parties desiring to occupy these grounds." *Id.* Thus, access to the picnic area was not unfettered. Finally, the Octagon building featured a restaurant—the Octagon Restaurant—that, in 1890, did nearly $2,000 in sales for the park. *Id.* at 44. Among the restaurant's selections were fruit, candy, peanuts, coffee, tea, and tobacco products. *See id.* at 58, 60 (listing end-of-season inventory). (The zoo animals benefited from leftover bananas, oranges, and nuts. *Id.* at 58)

{¶ 63} Cleveland's Board of Park Commissioners, a body of three, was the steward of Wade Park's evolution in its first decade. That is significant because Wade served 15 years as commissioner, until his death in 1890. *See* Twentieth Annual Report of the Park Commissioners, at 36. It follows that Wade approved, indeed he facilitated, the development of the zoo (with enclosures), turning the boat house into a livery, using a permit system for picnic groups, and opening a part-time restaurant at Wade Park. These developments, undertaken by a commission on which Wade served, inform what the Wade deed meant by "as a Public Park, to be open at all times to the public."

{¶ 64} "A public park," the commission's report explained, "is preeminently a public place of recreation, created and maintained for all, and not the use of any individual, organization or corporation, either in whole or in part." *Id.* at 11-12. Thus, the president of the Park Commission extolled Wade Park's "sylvan beauty to which *all are welcome*, rich and poor alike, where all may find

rest, inspiration and pleasure." (Emphasis supplied.) *Cleveland Metroparks Zoo* at 2. But that didn't prevent enclosures from separating humans and animals, thus creating zones off limits to the public. Nor did it prevent the leasing of the boat house to a boat-rental company that rented its vessels to the public.

{¶ 65} The Octagon Restaurant, like the botanical garden today, kept hours of operation—and was open only seasonally from May to November. *See* Twentieth Annual Report of the Park Commissioners, at 56. The park commissioners even required park-goers to obtain permission to have a picnic. This park history shows that erecting fences and barriers, charging usage fees, and keeping hours of operation are access restrictions familiar to Wade Park since its origin. They are restrictions that Jeptha Wade, park commissioner and author of the Wade deed, ushered in. It follows then that the zoo enclosures, boat rentals, and a restaurant with hours of operation were consistent with the Wade deed.

{¶ 66} The botanical garden fits neatly in the history of attractions offered at Wade Park. That history confirms that the botanical garden, in fencing off its grounds, charging admission fees, and keeping hours of operation, does not divert Wade Park from functioning as a public park "open at all times to the public."

### III. The lead opinion is right for the wrong reason

{¶ 67} The lead opinion forgoes any discussion of the words used in the deed. It announces that "CBG's operation of facilities" and the like, "and its charging fees to maintain those operations, is consistent with the terms of the Wade deed." Lead opinion at ¶ 24 But to get there, the lead opinion says merely that it's unrealistic to " 'maintain a beautiful and attractive park' " while simultaneously keeping it open 24 hours a day, seven days a week. *Id.* at ¶ 24. In other words, according to the lead opinion, the phrase "open at all times to the public" must permit the access restrictions at issue because it would be inconvenient for us to hold otherwise. But in my view, to determine whether a restriction comports with

26

the requirements of the deed, it is necessary to address the document's operative terms.

{¶ 68} Even though I believe the lead opinion gives short shrift to a challenging question of deed construction, we come to the same conclusion that the Wade deed does not prohibit the operation of the botanical garden. In addition, I join the lead opinion's conclusion that the Marketable Title Act, R.C. 5301.47 et seq., does not extinguish the interest of the Wade heirs.

### IV. Conclusion

{¶ 69} The operation of Cleveland Botanical Garden at Wade Park comports with the relevant deed language. Park history removes any doubt. For those reasons, I join the lead opinion in judgment only.

KENNEDY, J., concurs in the foregoing opinion.

### APPENDIX

**1. "Geese at Wade Park Zoo"**



Cleveland Public Library Digital Gallery, *Geese at Wade Park Zoo, Cleveland, Ohio* (ca. 1907), https://cplorg.contentdm.oclc.org/digital/collection/p16014coll6 /id/2095 (accessed Oct. 6, 2022) [https://perma.cc/XAU3-4YJH].

**2. "Scene at the Zoo, Cleveland, Ohio"**



Cleveland Public Library Digital Gallery, *Scene at the Zoo, Cleveland, Ohio* (1910-1924), https://cplorg.contentdm.oclc.org/digital/collection/p16014coll6/id/1819 (accessed Oct. 6, 2022) [https://perma.cc/5GCH-2SFQ].

———————

**FISCHER, J., concurring in part and dissenting in part.**

**{¶ 70}** This case involves a dispute between appellants and cross-appellees, the heirs of Jeptha Wade, the trustee of the Jeptha H. Wade Trust, and four intervenors (collectively, "the heirs"), and appellees and cross-appellants, city of Cleveland ("Cleveland"), Cleveland Botanical Garden ("CBG"), and University Circle, Inc. ("UCI"), over the management of Wade Park. The heirs essentially argue that Cleveland has allowed private entities, specifically CBG and UCI, to use Wade Park in a manner that is inconsistent with the conditions of the deed of gift from Jeptha Wade to Cleveland ("the Wade deed") and that impedes public access to the park. The heirs attempt to use their reversionary interest as a stick to ensure that Cleveland abides by the terms of the deed of gift. Cleveland, CBG, and UCI

28

attempt to remove the stick wielded by the heirs—quashing the heirs' complaints once and for all and ensuring no further disruption by the growing Wade family—by arguing that the heirs' reversionary interest was extinguished under the Marketable Title Act ("MTA"), R.C. 5301.47 et seq.

{¶ 71} This court accepted the appeal filed by the heirs and the cross-appeals filed by Cleveland, CBG, and UCI. The arguments made by each of the parties are detailed and nuanced, relying on the deed and various documents that inform the parties' intertwined relationships, and we endeavor to resolve the issues presented.

{¶ 72} The lead opinion somewhat addresses the arguments made by the heirs, but not to the extent that the issues were presented to this court. While I agree with some aspects of the lead opinion's discussion of the issues on appeal, I dissent from its resolution of some of those issues.

{¶ 73} I would find that the Wade deed of gift created a fee simple determinable and thus the Wade heirs' reversionary interest takes effect automatically upon the occurrence of the conditions for reverter in the Wade deed. I would also find that the wrought-iron-fence provision in the deed does not create a reversionary interest. And based on the plain language in the deed, I would conclude that the "open at all times to the public" provision does not prohibit CBG's fees for admission to the park, with two caveats. Admission fees are permissible so long as they do not interfere with the public's right to access the park and they are not used inconsistently with the park's purpose. I would find that there is a genuine issue of material fact as to whether CBG's admission fees, as permitted by Cleveland, meet that standard. And finally, I would find that CBG's parking fees are permissible under the deed. For those reasons, I must respectfully dissent from that portion of the lead opinion.

{¶ 74} As for the analysis of the issue on cross-appeal determining the application of the MTA, I agree with the lead opinion that the MTA does not

extinguish the heirs' reversionary interest.  Thus, I join section II(B) of the lead opinion.

## ANALYSIS

{¶ 75} There are three main issues presented under the heirs' proposition of law: (1) Does the Wade deed grant Cleveland the property in trust?  (2) Is the wrought-iron-fence-clause subject to the heirs' reversionary interest?  (3) Do CBG's admission and parking fees violate the terms of the Wade deed?

{¶ 76} Because the trial court disposed of these issues by summary judgment, *see* 2020-Ohio-1278, 153 N.E.3d 700, we review the matter de novo, *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, 3 N.E.3d 1173, ¶ 9.  Summary judgment is appropriate when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." (Cleaned up.)  *Id*.  On review of this case, I cannot agree entirely with the disposition of these issues by summary judgment.

### Wade Park is held in fee simple determinable

{¶ 77} The Wade heirs argue that Cleveland holds the property pursuant to a public trust.  Cleveland argues that the deed of gift did not create a trust and maintains that it owns the property.  I agree with the lead opinion that whether Cleveland owns the property or merely holds it in trust for the public is irrelevant under R.C. 755.19, because, in either circumstance, Cleveland must manage the property pursuant to the terms of the deed of gift.

{¶ 78} The issue whether Cleveland owns the property or holds it in trust is less important than the issue of Cleveland's compliance with the deed and how the heirs can enforce compliance with it.  Whether Cleveland is an owner or a trustee

matters less in this case than *how* the property is held, as the conclusion to the latter necessarily determines the reversionary interest of the heirs—otherwise known as "the stick" in this case. Given the Wade heirs' allegations against Cleveland and the dispute between the parties regarding the Wade heirs' ability to enforce the deed's provisions, it is important to clarify that the Wade deed created a fee simple determinable, not a fee simple subject to a condition subsequent.

**{¶ 79}** A fee simple determinable creates an estate in fee simple with a special limitation on the duration of the estate and the possibility of reverter. *See* 1 Restatement of the Law 1st, Property, Section 44, Comment a (1936); *Koprivec v. Rails-to-Trails of Wayne Cty.*, 153 Ohio St.3d 137, 2018-Ohio-465, 102 N.E.3d 444, ¶ 31. A fee-simple-determinable estate ends automatically upon the happening of a stated event, 1 Restatement of the Law 1st, Property, Section 44, at 121, and is created using language like " 'until,' 'during,' and 'so long as,' " *Koprivec* at ¶ 31.

**{¶ 80}** A fee simple subject to a condition subsequent, in contrast, creates an estate in fee simple that is limited by a condition, but it does not end automatically upon the occurrence of the stated condition and it permits only the party with the reversionary interest the right to exercise that interest. *See P C K Properties, Inc. v. Cuyahoga Falls*, 112 Ohio App. 492, 495, 176 N.E.2d 441 (9th Dist.1960); 1 Restatement of the Law 1st, Property, Section 45, at 133 (describing a fee simple subject to a condition subsequent as an estate in fee simple that, upon the occurrence of a stated event, may be terminated by the conveyor or the conveyor's successor in interest). A deed that creates a fee simple subject to a condition subsequent includes language that indicates that the termination of the estate is not automatic but instead is optional at the election of the reversionary-interest holder should the stated condition occur; examples of such language include "shall be subject to [the conveyor's] right to re-enter" or "[the conveyor] may enter and terminate the estate." 1 Restatement of the Law 1st, Property, Section 45, at Comment a and Comment b, illustrations.

**{¶ 81}** Here, the language of the Wade deed states that Jeptha Wade

do[es] hereby freely give, grant, and convey unto the said City of Cleveland and its successors, to have and to hold forever, the following described real property * * *. * * * This conveyance is made to the said City of Cleveland forever in trust for the following purposes and upon the express conditions [stated herein].

One of the express conditions was that Cleveland would spend no less than $75,000 to prepare and beautify the park within a stated timeframe. The deed of gift further states that

if the said Grantee *shall fail to comply* with the aforesaid stipulations for the expenditure of seventy-five thousand dollars, or if the grounds aforesaid or any part thereof shall be perverted or diverted from the public purposes and uses herein expressed, *the said property and every part thereof to revert to me or my heirs forever*.

(Emphasis added.)

**{¶ 82}** The language of the deed is clear: if Cleveland fails to comply with the various stipulations or uses the property for a purpose other than as a public park, then the property reverts to the heirs. The heirs do not have to *exercise* their right to the reversionary interest—the reversion happens *automatically*, based on the strong language in the deed and the lack of language allowing optional termination.

### Enforcing the conditions of the deed

**{¶ 83}** The heirs argue that CBG's fencing off areas of the park and charging admission and parking fees violates the conditions of the deed of gift and

that the appellate court erred to the extent that it held otherwise. When interpreting deeds, this court looks to the four corners of the document and construes the deed based on its plain terms. *Koprivec*, 153 Ohio St.3d 137, 2018-Ohio-465, 102 N.E.3d 444, at ¶ 23. When the intention of the parties is apparent from an examination of the four corners of the deed, it will be given effect regardless of technical rules of construction. *Id.* But we construe the terms of a deed of gift narrowly, to ensure that the terms conform to the purposes of the gift. *See* 59 American Jurisprudence 2d, Parks, Squares, and Playgrounds, Section 16 (2022) (providing that when an individual grants property to a municipality to be used for park purposes, the dedication shall be strictly construed according to its terms); *Bernstein v. Pittsburgh*, 366 Pa. 200, 206, 77 A.2d 452 (1951) ("where land is conveyed by the owner to a municipality for park purposes * * *, the terms of the grant must be narrowly construed and the uses to which the land may be put correspondingly restricted"); *Hamilton Cty. ex rel. Toftner v. Paul*, 1st Dist. Hamilton No. C-790758, 1980 WL 353126, *3 (July 23, 1980) ("Once an owner dedicates property to public purposes, it cannot be diverted therefrom and used for inconsistent purposes"). This is consistent with R.C. 755.19, which requires a city, as the owner or trustee of property that is to be used for park purposes pursuant to a deed of gift, to manage the property in accordance with the deed of gift.

{¶ 84} The lead opinion maintains that this court may not construe the terms of the Wade deed in the manner argued by the heirs because "[t]he city cannot be required to 'maintain a beautiful and attractive park' and at the same time permit 'all of the people' to freely access all parts of the park at all times." Lead opinion, ¶ 24. But this statement relies more on the lead opinion's own apprehensions about the enforcement of the deed than the plain language of the deed. Cleveland's use of Wade Park must conform to the conditions of the deed, as provided in the four corners of the deed, or else the property will revert to the heirs. If Cleveland cannot abide by the terms of the deed, then it should not have accepted those terms or it

should have negotiated different terms with the heirs who hold the reversionary interest. We should not avoid or disregard a condition in a deed of gift simply because it presents unforeseen difficulties for the grantee. Instead, we look only to the plain language of the deed to resolve any disputes regarding the grantee's compliance with its terms.

### The wrought-iron-fence clause is not subject to the heirs' reversionary interest

{¶ 85} The heirs argue that the wrought-iron-fence clause in the Wade deed is subject to their reversionary interest. This assertion is not supported by the plain language of the deed.

{¶ 86} The deed states in relevant part: "If fencing shall ever be placed on said Park grounds, except along the westerly and southerly boundary, it shall be open wrought iron fence." The wrought-iron-fence clause is preceded by a statement that Cleveland, "in substantial accordance with the plan" to be adopted by the Park Commissioners, must spend no less than $75,000 "in fitting, preparing and beautifying it for the purposes herein named." The wrought-iron-fence clause is then followed by various stipulations that conclude with the following:

> [I]f the said Grantee shall fail to comply with *the aforesaid stipulations for the expenditure of seventy-five thousand dollars*, or if the grounds aforesaid or *any part thereof shall be perverted or diverted from the public purposes* and uses herein expressed, the said property and every part thereof to revert to me or my heirs forever.

(Emphasis added.)

{¶ 87} Reading the reversionary clause in context with the rest of the deed, we can conclude that if Cleveland failed to comply with the stipulations for the

expenditure of $75,000 in fitting, preparing, and beautifying the park for the benefit of the public, or if Cleveland perverts or diverts from the public purposes and uses of the park as required under the deed of gift—i.e., if Cleveland fails to maintain a beautiful park that is open to the public—then the property reverts to the heirs. The wrought-iron-fence clause does not fall within the stipulations or public purposes set forth in the deed of gift, because the wrought-iron-fence clause is conditioned on the possibility that a fence *could be* erected—there was no guarantee that a fence would be placed on the park grounds, the $75,000 expenditure was not earmarked for the purpose of erecting a fence, and placing a fence on park grounds would not pervert the use of the property as a public park. Therefore, in my view, the appellate court correctly held that a violation of the wrought-iron-fence clause does not create a reversionary interest.

### The "open at all times to the public" provision

{¶ 88} The Wade heirs make several arguments regarding Cleveland's compliance with the Wade deed's stipulation that the park is "to be open at all times to the public." They challenge the admission and parking fees that are being charged to access parts of Wade Park because, in their view, those fees are inconsistent with that provision. At oral argument, they also challenged the validity of the time restrictions imposed by CBG under that same provision. We need only address the arguments related to the admission and parking fees, as those were the only issues briefed in this court. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17-20; *Hughes v. Hughes*, 2020-Ohio-4653, 159 N.E.3d 893, ¶ 19 (10th Dist.).

{¶ 89} Reading the "open at all times to the public" clause in isolation, it is easy to agree with the Wade heirs that by charging admission fees to access the botanical garden, CBG does not keep the park "open at all times to the public." But we cannot read that provision in isolation and must construe it consistently with the four corners of the deed.

{¶ 90} The provision, in full, states: "The said grounds *at all times* thereafter to be kept and maintained by said City in such repair and condition as to make it an attractive and desirable place of resort as *a Public Park to be open at all times to the public*." (Emphasis added.) The phrase "at all times" is used twice in the provision. A literal reading of the phrase "at all times" would mean that Cleveland must maintain the grounds all day, every day, and that the public must have unencumbered access to the park all day, every day. This literal reading does not make much sense in today's terms. But a reading of the deed today may not be consistent with what was meant by Jeptha Wade in 1882 when the deed was executed—we have to travel back in time a bit to determine the meaning of "at all times."

{¶ 91} Courts have addressed "at all times" language in a few instances during that period. *See, e.g.*, *Potter v. Burton*, 15 Ohio 196 (1846); *David Gibson & Co. v. Farmers' & Mechanics' Ins. Co*., 13 Ohio Dec.Rep. 629, 1871 WL 5839 (Ohio Super.1871); *State v. Stichtenoth*, 19 Ohio Dec. 623 (C.P.1909). In *Potter*, this court interpreted a deed that included "at all times" language and determined that the language likely gave the defendant in that case an unrestricted ability to conduct certain activities in relation to the property at issue. *Id.* at 199. About 25 years later, in *David Gibson & Co.*, another court addressed the meaning of the phrase "on duty at all times" in an insurance policy. There was no dispute over what "at all times" meant—it meant the entire or whole time without stopping. *See id.* at 629. And in 1909, the court in *Stichtenoth* noted that "at all times" in a grand-jury statute meant that prosecuting attorneys had a right to be with the grand jury the entire time of the proceedings, except when stated otherwise. *Id.* at 634. This court and the other courts obviously read "at all times" in the context of the documents or law at issue in each case, but the meaning of that phrase remains consistent; "at all times" means always.

**{¶ 92}** Even if we look to a dictionary definition of the phrase "at all times," we come to the same conclusion. *Merriam-Webster* defines "at all times" as "without stopping or changing at any time: always." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/at%20all%20times#:~:text =Definition%20of%20at%20all%20times,the%20vehicle%20at%20all%20times (accessed Aug. 31, 2022) [https://perma.cc/3JPB-5F6S]. And *Cambridge Dictionary* defines the phrase as "continuously." *Cambridge Dictionary Online: English Thesaurus*, https://dictionary.cambridge.org/us/thesaurus/at-all-times (accessed Aug. 31, 2022) [https://perma.cc/4DB8-3533]. So reading "at all times" in light of its usage at the time of the deed of gift and considering our common understanding of the phrase, we must conclude that "at all times" means "always."

**{¶ 93}** This interpretation makes sense. The provision at issue, "[t]he said grounds *at all times* thereafter to be kept and maintained by said City in such repair and condition as to make it an attractive and desirable place of resort as *a Public Park to be open at all times to the public* [emphasis added]," would mean that Cleveland must always keep the grounds in repair to make it a beautiful place as a public park. This would not require around-the-clock care—just proper maintenance to ensure the park is perpetually beautiful. And as for the phrase "open at all times to the public," it means that the park must always be open to the public.

**{¶ 94}** Next, we must determine what it means for the park to always be open to the public and whether charging admission fees is consistent with that definition. In this context, "open at all times to the public" necessarily means that access to the park shall not be restricted to a particular group of people. *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/open (accessed Aug. 31, 2022) [https://perma.cc/TTW5-6F4F] (defining "open" as "not restricted to a particular group or category of participants"). Here, the word "open" means that the public must have access to the park. *See id.*

**{¶ 95}** What this "access" looks like is another issue. Does the entire provision mean that the public must have unencumbered access to the park 24 hours a day, 7 days a week? Or does it merely mean that all members of the public must have the same complete access to the park and that the park was not meant to be privatized, closed off, or otherwise restricted in some manner? These questions are not answered outright in the deed, but a review of the "open at all times to the public" provision and other provisions in the deed tends to support the latter interpretation.

**{¶ 96}** We know that Jeptha Wade did not add a limitation or restriction in the "open at all times to the public" provision. He knew how to restrict rights provided in the deed of gift, as he subjected abutting landowners' free ingress and egress rights to the Park Commissioners' rules and regulations. He chose not to include the same restrictions in the "open at all times to the public" provision. The lack of a restriction or limitation in that provision supports the position that no restrictions, even admission fees, would be permissible. In other words, the provision means what is says.

**{¶ 97}** But when reading the "free ingress and egress" provision that follows the "open at all times to the public" provision, we are provided with additional context. Pursuant to the deed of gift, Cleveland must permit abutting landowners and their heirs and assigns "free ingress and egress through the [park], subject forever to all rules and regulations prescribed [by] the Park Commissioners." The "free ingress and egress" provision expressly provides a right to the abutting landowners, which necessarily means that the public does not have the same right under the deed. There would be little point to guaranteeing the abutting landowners "free ingress and egress" through the park in the deed of gift if everyone's access to the park was unencumbered. While the "open at all times to the public" provision appears to guarantee the public unencumbered access to the park when read alone, this access may in fact be limited in some manner, as

illustrated by the "free ingress and egress" provision that follows. This indicates that the "open at all times to the public" provision was intended to be read generally to guarantee that all members of the public always be welcome in the park and does not necessarily guarantee unrestricted access to the park.

{¶ 98} So with the understanding that the park was intended to always be open to the public and that public access could be subject to some limitation as to ingress and egress, we must determine whether admission fees are permitted under the deed of gift. The trial court determined that the fees are consistent with " 're-creating, having, improving and maintaining a beautiful and attractive Public Park,' " 2020-Ohio-1278, 153 N.E.3d 700, at ¶ 18, but that clause does not apply to Cleveland. The clause refers to the reasons why Jeptha Wade deeded the land to Cleveland. While the clause may be relevant to how admission fees may be spent, it is not helpful to the determination whether those fees are permitted by the deed in the first place. Rather, we should acknowledge that the deed neither forbids nor allows admission fees. But looking at the "open at all times to the public" provision in light of the "free ingress and egress" provision, we cannot conclude that charging admission fees is inconsistent with the deed.

{¶ 99} Merely because something is "open" does not mean it is "free." The fact that Jeptha Wade chose to use the word "open" instead of "free" in the "open at all times to the public" provision, especially when he used variations of the term "free" twice in other sections of the deed—the "free ingress and egress" provision and the "freely give, grant, and convey" clause—indicates that the terms "open" and "free" have different meanings. Whether the term "free" means "free of charge," "unrestricted," or "unencumbered," that type of language simply does not exist in the "open at all times to the public" provision. The lack of this language in the provision and the context in which we must read it supports the conclusion that Wade believed that the public may, in the future, be charged an admission fee or be restricted from moving through the park in some manner. Admission fees,

therefore, are permitted under the deed as a type of limited restriction on public access to the park.

{¶ 100} But the analysis does not stop there. Though the parties have argued over Cleveland's ability to charge admission fees, they also disagree about the monetary range and permissible use of those fees. The Wade heirs argue that admission fees, even at the nominal level, are inconsistent with the language of the deed and the purpose of Wade Park as a public park, as they can deprive members of the public of meaningful access to the park. Cleveland, CBG, and UCI maintain that they may charge reasonable admission fees, consistent with what other parks and nonprofit organizations do around the country. We need not look to the findings of other courts across the country that reviewed different deed language. Rather, the issue is whether charging admission fees is consistent with the Wade deed.

{¶ 101} Though an admission fee may be permissible under the deed as a type of limited restriction on access to the park, the language of the deed supports the conclusion that the fee must be nominal, to ensure that the public has meaningful access to the park consistent with the "open at all times to the public" provision and the purpose that the park be "for the benefit of all the people." Otherwise, if the admission fee is so costly as to restrict public access to only individuals who can afford the fee, the park is not "open at all times to the public" and does not serve to benefit "all the people." Additionally, the admission fees may not be used in a manner that is inconsistent with the deed's use restriction that the grounds are "[t]o be [used] for no other purpose than [as] a public park." Whether the current admission fee conforms to those conditions is a question of fact for the fact-finder to determine.

{¶ 102} As for parking fees, a parking garage is located underneath Wade Park and provides access to the botanical garden. The parking garage does not appear to have changed the appearance of the park or its use. The garage is used

"to make [the park] an attractive and desirable place of resort"; it does not change the aesthetic of the park, and it ensures easy access to the park for the driving members of the public. The fees for parking in the garage do not directly limit public access to the park, because people can access the park by other means. And the parking fees are not directly prohibited by the terms of the Wade deed. Thus, the parking fees are not contrary to the use of the property for park purposes and do not violate the "open at all times to the public" provision.

## CONCLUSION

{¶ 103} It appears to me that summary judgment was inappropriately granted as to the admission-fees issue. Admission fees are permitted under the Wade deed, but only so long as they do not eviscerate its "open at all times to the public" provision by denying members of the public meaningful access to the park and are not used in a manner inconsistent with the park's purpose. There is a genuine issue of material fact about whether the admission fees charged by CBG, as permitted by Cleveland, comply with those restrictions. The parking fees, however, do not violate the terms of the Wade deed, so summary judgment was appropriate on that matter. We should reverse the appellate court's judgment in part, affirm it in part, and remand the cause to the trial court for further proceedings on the issue of the admission fees and the other issues recognized by the appellate court. Thus, I respectfully concur in the lead opinion in part and dissent in part.

_____

Hahn, Loeser & Parks, L.L.P., Eric B. Levasseur, Steven J. Knerly Jr., and Dennis R. Rose, for appellee and cross-appellant Cleveland Botanical Garden.

Squire Patton Boggs, L.L.P., Steven A. Friedman, and Sean L. McGrane, for appellee and cross-appellant University Circle, Inc.

Barbara A. Langhenry, Director of Law, and L. Stewart Hastings Jr., Assistant Director of Law, for appellee and cross-appellant City of Cleveland.

Strauss Troy Co., L.P.A., Matthew W. Fellerhoff, William K. Flynn, Amy

L. Hunt, and Stephen E. Schilling, for appellants and cross-appellees Staci K. Worthington Drewien et al.

Robert E. Johnson, urging reversal in part and affirmance in part for amicus curiae, Institute for Justice.

_____